785 So.2d 1182 (2001)
David Charles CARPENTER, Appellant,
v.
STATE of Florida, Appellee.
No. SC90349.
Supreme Court of Florida.
March 1, 2001.
Rehearing Denied May 18, 2001.
*1185 James Marion Moorman, Public Defender, and Robert F. Moeller, Assistant Public Defender, Tenth Judicial Circuit, Bartow, FL, for Appellant.
Robert A. Butterworth, Attorney General, and Carol M. Dittmar, Assistant Attorney General, Tampa, FL, for Appellee.
PER CURIAM.
We have on appeal the judgment and sentence of the trial court imposing a death sentence on David C. Carpenter. We have jurisdiction. See art. V, § 3(b)(1), Fla. Const. As more fully explained below, we reverse Carpenter's conviction and remand for a new trial because the trial court prohibited Carpenter from presenting certain evidence to the jury during the guilt phase of the trial.

I. BACKGROUND
Shortly before midnight on Thanksgiving Day, November 24, 1994, two law enforcement officers in Clearwater, Florida, investigated a blue 1989 Ford Taurus sedan parked in a field near the Pinellas County Trail. The officers discovered that the interior of the vehicle had been burned; two Molotov cocktails, each comprised of a 16-ounce juice bottle with a rag for a wick, rested in the back seat of the vehicle. A check of the vehicle's license plate revealed the registered owner to be Ann Powell, a sixty-two year old female resident of nearby Dunedin.
Upon discovering that the vehicle had been burned, additional law enforcement officers responded to the scene to conduct a further investigation. In the trunk of the vehicle, officers discovered a "white bedspread type blanket," upon which there was some light sooting. When the blanket was lifted, officers found a small "white person's body." At that point, law enforcement personnel transported the vehicle to a secured police facility and attempted to locate Ann Powell.
At Ann Powell's residence, officers identified a red notebook in which Powell recorded miscellaneous notes. Many of the entries in the notebook were dated, and one of the entries read "5:33" next to "Dave." This notebook entry was later matched with a telephone message from Powell's answering machine, which was left at 5:33 p.m. on November 23, 1994. The content of the recorded message was as follows: "Hi Ann, this is Dave. Are you there? I just want to know if we're still on for tonight. I'll check back at about a quarter 'til. Thank you." There also was one earlier message from "Dave" left at 1:17 p.m. on November 22, 1994: "Hi. Ann, this [is] Dave. How about dinner tonight, dinner and dance? If you want to, you can meet me here ator by theit's the same place where I met you, at 6:00 o'clock, and I'll call you back later."
At the secured police facility, the medical examiner and various law enforcement officers investigated the vehicle and Powell's body. After unwrapping Powell's body from the white blanket, it was clear that her head had been wrapped in a white towel, which was bloody on the top. Powell had been "hog-tied" with her arms and legs behind her back. Specifically, ropes had been wrapped around her neck and hands several times and then connected with twine that bound Powell's feet. Further, a bra had been wrapped around Powell's neck and across her mouth as a gag. The bra gag had been tightened to the extent that it caused Powell's tongue to protrude from her mouth and produced blood-filled blisters on her neck. Additionally, there were five cord wrappings below the level of the bra gag and two cord wrappings above the level of the gag. *1186 Powell was naked except for the bra gag and knee-high hosiery still on her feet.
The cause of Powell's death, as ascertained by the medical examiner, was "homicidal violence, including neck compression and blunt trauma to the head and neck." As to the "neck compression," the hyoid bone in Powell's neck was not fractured, and the cause of Powell's death was not consistent with either a hanging or garroting type of strangulation. Instead, the "neck compression" was consistent with the occlusion of blood vessels in Powell's neck. If a force of at least eight pounds were applied continually to the blood vessels on either side of Powell's neck to cause the vessels to become totally occluded, she could have become unconscious in ten to fifteen seconds. However, to cause the death of a person by this method of neck compression, the medical examiner opined that "the pressure must be kept up for a period of several minutes." According to the medical examiner, the bindings around Powell's neck could have caused the neck compression, and the bra gag could have partially occluded Powell's blood flow by pushing Powell's jaw downward.
Powell's injuries, as noted at the autopsy, included (1) a bruise to the left eye, consistent with having been struck with a blunt object; (2) a laceration to the gum inside the lip; (3) a bruise on the tongue consistent with a biting down on the tongue; (4) left cheek discoloration; (5) a cyst or canker sore under the tongue, possibly caused by the bindings; (6) a bruise behind the left ear; (7) indentations and scrapes on the neck cause by the bindings; (8) several bruises to the side of the head; (9) a small forearm scrape; (10) a bruise and scrape on the elbow; (11) a bruise on the right leg; (12) small contusions and a laceration[1] to the anal and vaginal areas; (13) four subgaleal bruises located between skull and scalp; and (14) another bruise under her right ear cartilage. Most of these injuries were consistent with having occurred prior to death, although the bindings on Powell's body were consistent with having been placed after death. No defensive wounds were noted. According to the medical examiner, it was "within the realm of possibility" that Powell's vaginal injuries were the result of consensual sex, as those injuries were "merely an indication of the degree of force of penetration." The medical examiner testified, however, that the vaginal injuries could have been consistent with a forcible rape, depending upon Powell's sexual history. Further, Powell had blood on her fingers, but there was no injury to that area of her body. At the time of the autopsy, Powell's stomach contained "about a half a cup of tan, opaque fluid and you could see identifiable fragments of potato and a green vegetable," and a sample taken from Powell's vagina failed to show any trace of semen.
On Monday after the Thanksgiving weekend, Robert Joseph Penn IIIwho lived in Dunedin at the opposite end of a triplex where Carpenter residedhad a conversation with Carpenter. At the time, Carpenter was thirty-two years old, approximately six feet four inches tall, and weighed approximately 210 pounds. Penn was coming home from work, and Carpenter, who was on his own porch, called Penn over. During the conversation, Carpenter asked Penn if he had seen the news, and Penn indicated that he had not. Carpenter then told Penn that he (Carpenter) might be in trouble because someone for whom he had arranged a date might have *1187 been involved in some problems. Specifically, Carpenter had seen on the news that the person's car had been burned. Although Carpenter did not mention the name of the person to whom he had introduced the woman, Penn said he knew it was an individual named Neilan Pailing because "there was only one child molester on the block and he left for Alaska that week." Penn noted that when Carpenter was talking to him, Carpenter talked normally and appeared to be a little nervous and agitated, but that was normal for Carpenter. Carpenter stated that he thought he should leave town because "he thought something bad had happened to her [Powell]," and when Carpenter asked for Penn's opinion, Penn advised Carpenter that if he had not been involved, he should inform the police immediately; if he was involved, he should consult an attorney. Penn testified that he remembered seeing the car in question in Carpenter's driveway on the evening before Thanksgiving. Specifically, the car was in Carpenter's driveway when Penn came home from work between 5 and 6 p.m., and it was still there when Penn left at approximately 8:30 p.m. Further, Penn did not hear any unusual noises while he was home during that time period.
At 6:44 p.m. on Tuesday, November 29, 1994the day after the conversation between Penn and Carpenterthe Clearwater Police Department Communications Division received a telephone call from a person identifying himself as Carpenter. Carpenter indicated that he "did some work on that car they pulled today. They found that person in it, in the trunk of the car." The communications officer asked whether Carpenter was referring to the woman from Dunedin, and Carpenter responded affirmatively and indicated that he lived in Dunedin as well. Upon being asked when he had worked on the car Carpenter indicated that he had worked on the vehicle the preceding week. Carpenter then left a telephone number at which he could be contacted.
After Carpenter's initial communication with the police, Detective James Steffens (Detective Steffens) called the number left by Carpenter. Detective Steffens spoke with Carpenter, who indicated that he had been with the victim on November 23 and had worked on her car, which he had seen on television. Carpenter described the victim as having frosty strawberry colored hair, five feet six inches to five feet eight inches tall, and in her forties to fifties. Carpenter characterized himself as a handyman and a mechanic, and he stated that he replaced the fuse for a light in the trunk of the victim's car. Also during the phone conversation, Carpenter explained that he and his friend, Neil Pailing, had engaged in a "threesome" sexual encounter with the victim. Carpenter said that Pailing was a violent person and he feared that the woman may have come to harm with Pailing, but Pailing and Powell left Carpenter's house after dinner, and Carpenter did not know where they had gone. At the conclusion of the phone conversation, Carpenter agreed to meet personally with the police.
Detective Steffens called several other officers to assist him, including Sergeant Mark Teunis (Sergeant Teunis) and Detective Howard. Sergeant Teunis first met Carpenter at Carpenter's sister's house. Sergeant Teunis identified himself as a police officer, met Carpenter and Carpenter's sister, and then spoke briefly with Carpenter in the residence. During this conversation, Carpenter indicated that "[h]e had just returned back in town on that Tuesday and he had ridden his bike up to his sister's house in Palm Harbor. And from there he had seen the news and on the news he saw a news blurb of the homicide scene and the vehicle. And *1188 that's why he decided to call." Carpenter agreed to speak further with the police at the police station, and Sergeant Teunis and Carpenter exited the residence.
As Sergeant Teunis and Carpenter exited the residence, Detective Steffens and another detective arrived in an additional vehicle. Carpenter then traveled to the police station with Sergeant Teunis and Detective Steffens. During the drive, Carpenter again stated that he was a handyman and had worked on Powell's car. He recounted that he had met Powell at a laundromat in Dunedin and that he and his friend Neil Pailingwho at that time was seventeen years old, approximately five feet ten inches to six feet tall, and weighed approximately 120 poundswere going to have a party on the night of Wednesday, November 23, 1994. Carpenter indicated that he had invited Powell to the party and that he and Powell had engaged in sexual foreplay. Carpenter indicated that after talking with Pailing's stepfather, he understood that Pailing had left town on Thanksgiving Day. Both Sergeant Teunis and Detective Steffens noted that Carpenter stared straight ahead throughout the drive to the police station, except when they drove near the field where Powell's vehicle had been found, at which time he looked in the opposite direction. Finally, Detective Steffens found it interesting that Carpenter had volunteered that he had no weapons on him, "in case they [Sergeant Teunis and Detective Steffens] were wondering."
At the police station, Detective Steffens and Detective Howard began more formal discussions with Carpenter. Carpenter again told the detectives that he and his friend Pailing were having a party to which he had invited Ann Powell. The party was originally scheduled for Tuesday, November 22, but Powell had canceled because she was going to a church service. Carpenter stated that he rescheduled the party for November 23, and he made arrangements with Powell by telephone to meet her at the laundromat where they first met. Carpenter stated that he walked to the laundromat, where Powell met him, and Carpenter rode with Powell in her car back to his residence. Carpenter stated that he prepared pasta and beans for dinner, which Powell ate, and Powell drank tea after indicating that she did not drink alcoholic beverages. Carpenter advised the officers that he and Powell began fondling one another, whereupon Pailing entered Carpenter's residence and became embarrassed by such behavior. Carpenter explained that he and Pailing had been with another woman together and they each had a type of sexual dysfunction; Pailing was a "premature ejector [ejaculator]", while Carpenter took a long time to get erect and was occasionally impotent.
Carpenter told the detectives that Powell, wanting to "spend some time" alone with Pailing, asked Carpenter to go out and fix the trunk light fuse in her car. Carpenter indicated that he did so, and he needed to shift some boxes in Powell's trunk, all of which appeared to contain her personal belongings, to reach the defective light. Carpenter indicated that the potential for finding his fingerprints in the trunk of Powell's car prompted him to contact the police. Carpenter also stated that while he was outside, he heard the station on the radio inside his residence being changed from the original station to a rock station, and the volume was increased. He told the detectives that a little while later, Pailing and Powell walked out of his residence and left in Powell's car, with Pailing driving. Varying from his statements made en route to the police station, Carpenter told the detectives that Pailing left the State on Saturday, which would have been November 26, 1994, instead of Thursday, *1189 Thanksgiving Day. After hearing Carpenter's story, the detectives inquired if he would take them to his house for an inspection, and he agreed, signing a form giving permission to allow the walkthrough.
Detective Steffens and Detective Howard drove Carpenter to his residence, but because Carpenter had left his keys at his sister's residence, Sergeant Teunis was dispatched to that location to obtain the keys. All of these parties finally met at Carpenter's residence, which was a small, one-bedroom efficiency-style apartment. The front door of the apartment opened into an area with a couch, a bed, a bookshelf, a desk, and other furniture, and there was a kitchen and bathroom separated from the living area/bedroom by a partition. Carpenter afforded the officers a tour of his residence, pointing out that he was a collector of Star Trek memorabilia, and showing them a couple of toy guns, which he referred to as "nonguns." One of the toy guns was a rifle type BB gun that was above one of the exit doors, and another was a replica of a semiautomatic pistol that had a scope duct-taped on it, which Carpenter produced from a desk drawer. Carpenter also showed the officers a package of cigarettes that he said Ann Powell had left behind.
There was a discolored area of carpet near Carpenter's bed. Sergeant Teunis asked Carpenter if he had spilled something, and Carpenter replied in the affirmative. Carpenter also showed the officers a shed at the back of his residence. Sergeant Teunis then asked Carpenter to permit a forensic science unit to thoroughly search Carpenter's residence for any evidence, and Carpenter agreed. At this time, Carpenter agreed to return to the station for more questioning.
During the second round of discussions at the police station, Carpenter indicated that he met Ann Powell at a laundromat on November 20, 1994. He stated that the party involving Neil Pailing was not planned, but instead was a spontaneous surprise for Pailing. Carpenter indicated that he picked Powell up on November 23, 1994, and they ate dinner consisting of pasta and beans, but when asked to clarify this, Carpenter said that Powell did not eat or did not want to, and she only drank tea. Carpenter stated that he engaged in consensual foreplay with Powell, whereupon Pailing came over, and Powell asked if she could spend some time with Pailing. Carpenter proceeded outside to work in the trunk of Powell's car. Carpenter again stated that Pailing and Powell left sometime thereafterhe believed they were going to a motelafter which Carpenter lost control of his bowels in his apartment and went to seek medical attention.
After a break in questioning, Detective Steffens and Detective Howard again spoke with Carpenter, at which time Carpenter relayed a different version of events to the officers. In this version, Carpenter said that Neil Pailing had a problem with little children and was into Dungeons and Dragons, a science fiction-type game where people assume characters and play out scenarios and fantasies. Carpenter said he wanted to help Pailing "get into manhood" by having a lady come over for a "threesome." Carpenter described how he fondled Powell's vagina through her pants "to get her warmed up for Neil." When Pailing came in, Powell wanted to spend some time with him, and Carpenter went outside and positioned himself where he could see them through a window. He observed Pailing and Powell engage in "doggy style intercourse," but it appeared to him that Pailing had a "premature ejection [ejaculation]" which caused Powell to become angry. Carpenter *1190 indicated that Powell began belittling Pailing. Carpenter stated that he turned away, but upon hearing a loud thump, he turned his attention back inside. He saw Powell on the floor and heard that his music had been turned from the blues music station to a hard rock station, and the music was extremely loud.
At this point, Pailing allegedly was on top of Powell "choking her out" and laughing. Specifically, Pailing was "kind of sitting on her back and had his right arm up under her neck and the cleft of his palm was at the base of her neck and he was choking her up." Carpenter said that he started "freaking out" and thought that Pailing might have killed Powell, and when he walked into the apartment, Pailing started making fun of him and calling him a coward. Powell lay motionless on the floor, with rope and twine lying next to her. Pailing suggested to Carpenter that the police could not do anything to him because he was 17. Carpenter said he wanted to call the police, but he told Pailing that he was going to go to the laundromat and walk around and that Pailing and Powell had better not be in Carpenter's residence when he returned. When Carpenter came back, Pailing was attempting to drive Powell's car away but was having trouble with the headlights. Pailing ultimately drove away with the headlights off. Inside his apartment, Carpenter observed a bloody area on the carpet where Powell had been which he tried to clean. Carpenter stated that he was "sick at the sight of it." Carpenter again indicated that he learned that Pailing had left on Saturday, and in this discussion he did not indicate that he had performed any work on Powell's car.
After the detectives expressed that they were having some problems with Carpenter's version of the events, another discussion commenced. During this discussion, Carpenter again mentioned Dungeons and Dragons, and stated that Pailing assumed a character that was very evil and roamed the world. Carpenter then said that he, Powell, and Pailing were naked on the living room floor, and Carpenter was having consensual sexual intercourse with Powell in a regular fashion, while wearing a condom. Carpenter completed the act, but did not ejaculate, and went to the bathroom to clean up, while Pailing "started in the doggy style fashion intercourse with her." It appeared that Pailing, who was not wearing a condom, "had a premature ejector," and there was loud thump, and Powell began belittling Pailing, asking why could he not be like Carpenter. Carpenter ran out of the bathroom so quick that he "urinated on himself," and he found Pailing choking Powell in the manner Carpenter had described before. He believed Pailing struck her with a "nongun" that was lying on the floor. Carpenter was yelling at Pailing, "What have you done?" Carpenter then advised Pailing, "You bagged it, you tag it," and he told Pailing to use some rope and twine that was in the apartment. Carpenter provided Pailing instruction as to how to hog-tie Powell, advising "like you would do in a rodeo." Pailing then obtained a blanket in which they wrapped Powell, and Carpenter backed Powell's car up to a boardwalk that extended along the length of the efficiency to the driveway. Pailing attempted to drag Powell across the boardwalk, but Carpenter did not approve of the manner in which he was dragging her, so Carpenter picked up Powell's body and "gently put her in the trunk." Pailing then prepared two Molotov cocktails, and Carpenter then understood that Pailing intended to burn Powell's body. Carpenter gathered Powell's blouse, pants, and panties so that Pailing could dispose of the items with the body. Carpenter stated that he did *1191 not know the location Pailing intended to use to dispose of the vehicle.
After these events, Carpenter described that he attempted to scrub the bloodied area from the carpet, and he then sprayed over the area with black enamel spray paint. He placed a pack of Powell's Capri cigarettes in a box and returned the "nongun" back to the desk drawer. He transported some of the boxes of Powell's belongings from the trunk of her car to the shed behind the apartment, along with some of Pailing's other belongings. When asked whether Powell was wearing any clothing when she was placed in the trunk, Carpenter indicated that she was wearing her bra on her chest, "but it actually had one breast exposed." Carpenter admitted that he washed his clothes at the laundromat and, on Thanksgiving morning, he went to his sister's house and then to the home of his parents. Carpenter also explained that he contacted the police after seeing Powell's car profiled on television, as he wanted law enforcement officials to know that he had worked on the car, and therefore his fingerprints might be found on the vehicle.
After providing Carpenter his Miranda warnings, the officers proceeded to obtain a taped statement from him. The recorded statement was played for the jury. During this statement, Carpenter reiterated that he had invited Powell to a party and had engaged in a sexual "threesome" with her and Pailing. He observed that Pailing had been nervous at first, but Powell had talked Pailing into removing his clothing. After Carpenter had terminated his involvement, he had walked into the bathroom and after hearing a commotion, he returned to see Pailing striking Powell on the head or face with Carpenter's gun.[2] Pailing was strangling her and she was turning purple, and Carpenter was "not doing anything except for freaking out." Powell's head was bleeding, so Carpenter gave Pailing a towel to prevent Powell's blood from falling on the carpet. Pailing requested instruction as to know how Powell should be secured and Carpenter instructed him "to tie her up like you would do a critter, an animal, and he proceeded to do so." Pailing procured blanket-type material, and Carpenter placed her in the blanket and wrapped the material around her. Pailing proceeded to drag Powell outside and down the boardwalk, but Carpenter intervened and picked her body up and placed it in the trunk. Carpenter then began to clean the carpet. Pailing "had gasoline and an apparatus ... to dispose of Ann in the car," and he had her clothes in a bag to dispose of them as well. At that point, Carpenter observed Pailing driving away. Carpenter voiced that the event had not been a "planned thing" and "was not supposed to happen." Carpenter volunteered that had he known that Powell was going to be hurt, he would not have invited her there.
The physical evidence demonstrated that Carpenter left a fingerprint from his left little finger on a can of black spray paint retrieved from his garbage, and a print lifted from the right front passenger side fender of Powell's car matched Carpenter's left thumb. A print from the right rear passenger doorframe of the vehicle was linked to Pailing's right ring finger. A sample from Carpenter's toy gun, and fingernail scrapings from Ann Powell, were positive for the presence of blood, but the amount was insufficient to provide a conclusive determination as to identity from the blood. A carpet sample taken from Carpenter's residence also tested positive for the presence of blood, *1192 and a DNA test on that sample showed that the blood was consistent with Powell's blood, but not consistent with that of Carpenter or Pailing. Semen was detected on the white blanket removed from Powell's vehicle, but the semen was not consistent with either Carpenter or Pailing. DNA testing on blood removed from Carpenter's jeans was consistent with Carpenter, but was also consistent with Pailing, or could have been a combination of blood from Carpenter, Pailing, and Powell. Twisted twine removed from Powell's wrists was consistent in appearance, construction, composition, and microscopic characteristics with a spool of twisted twine found under the shed at Carpenter's residence. Braided rope removed from Powell's wrist and neck areas was consistent in construction, appearance, generic fiber types, and microscopic characteristics with rope found in Carpenter's residence. Hair samples taken from Carpenter's apartment and from Powell's body were generally inconclusive, while the replica pistol from Carpenter's residence produced four Caucasian body hairs and four Caucasian peripheral head hairs from which no identifying conclusions could be drawn. However, the sample from the replica pistol did produce one Caucasian head hair fragment that was microscopically different from Powell, Carpenter, and Pailing, and one Caucasian pubic hair that was microscopically different from those three individuals.
Finally, the State presented the testimony of Steven Dakowitz, who was incarcerated in the same jail pod with Carpenter for approximately one and one-half months. Dakowitz testified that Carpenter initially told him that Carpenter's role in the incident was very limited, that he had just helped load the body into a car, and the other individual was responsible for the rest. Dakowitz testified that he and Carpenter discussed how Carpenter would be exonerated when the authorities found "this kid," but after hearing a news report stating that Pailing had been located, Carpenter became "a little agitated" and "bummed out." Dakowitz testified that he overheard Carpenter crying on the phone, saying, "It's all over now. He knows exactly what happened and I'm going to fry." Later, Dakowitz inquired of Carpenter as to why he was upset, saying, "I thought you said your role in it was pretty limited." Dakowitz testified that Carpenter responded with something like "Let's just say it was just the opposite," and that matters were only going to get worse.
After considering the above evidence, as well as testimony from Carpenter's mother concerning Carpenter's background and functional abilities,[3] the jury returned a general verdict finding Carpenter guilty of first-degree murder. The trial court then conducted a penalty phase hearing, at the conclusion of which the jury recommended application of the death sentence by a vote of seven to five. The trial court conducted a second penalty phase hearing, however, because an erroneous jury instruction had been given during the first penalty phase hearing.[4] At the conclusion of the second *1193 penalty phase hearing, the jury recommended the death penalty by a vote of ten to two. After receiving sentencing memoranda from the parties and conducting a hearing pursuant to Spencer v. State, 615 So.2d 688, 690 (Fla.1993), the trial court followed the jury's recommendation and sentenced Carpenter to death. In doing so, the court determined that the three aggravating circumstances established by the State[5] outweighed the one statutory mitigating circumstance[6] and two nonstatutory mitigating circumstances established by the defense.[7] Carpenter now appeals from his conviction and sentence, asserting three guilt phase issues and two penalty phase issues for our consideration.

II. ISSUES AND ANALYSIS

A. SUFFICIENCY OF THE EVIDENCE
In his first issue regarding the guilt phase of the trial, Carpenter argues that the State failed to present sufficient evidence to support a conviction for first-degree murder based upon a premeditation or felony murder theory. As more fully explained below, while we determine that the State failed to present sufficient evidence to support a conviction on a premeditation theory, however, we further determine that the State did present sufficient evidence to support a conviction for first-degree felony murder with sexual battery as the underlying predicate felony offense.
Carpenter argues the evidence presented at trial fails to show that (1) he actually killed Powell or was a principal in a murder committed by Pailing; (2) Powell was killed with premeditation; or (3) Powell was killed during the commission of a sexual battery. Relying on these arguments, Carpenter claims that the trial court should have granted his motions for judgment of acquittal (JOA motions) offered at the close of the State's case and at the close of all the evidence. Assuming arguendo that the State's case against Carpenter was entirely circumstantial,[8] we apply the following standards in evaluating Carpenter's contention that the trial court should have granted his JOA motions:

*1194 A motion for judgment of acquittal should be granted in a circumstantial evidence case if the state fails to present evidence from which the jury can exclude every reasonable hypothesis except that of guilt....
It is the trial judge's proper task to review the evidence to determine the presence or absence of competent evidence from which the jury could infer guilt to the exclusion of all other inferences. That view of the evidence must be taken in the light most favorable to the state. The state is not required to "rebut conclusively every possible variation" of events which could be inferred from the evidence, but only to introduce competent evidence which is inconsistent with the defendant's theory of events. Once that threshold burden is met, it becomes the jury's duty to determine whether the evidence is sufficient to exclude every reasonable hypothesis of innocence beyond a reasonable doubt.
State v. Law, 559 So.2d 187, 188-89 (Fla. 1989) (citations omitted) (footnote omitted). Stated another way, "[T]he sole function of the trial court ... is to determine whether there is a prima facie inconsistency between (a) the evidence, viewed in the light most favorable to the State and (b) the defense theory or theories. If there is such inconsistency, then the question is for the finder of fact to resolve." Orme v. State, 677 So.2d 258, 262 (Fla.1996). Carpenter's hypothesis of innocence in this case is based on his recorded statement that was played for the jury at trial. Specifically, Carpenter asserts that after he had completed consensual sexual intercourse with Powell and had retreated to the bathroom of his efficiency-style residence, Neil Pailing killed Powell by bludgeoning and strangling her after she belittled Pailing for prematurely ejaculating. Carpenter asserts that he heard the commotion, came out of the bathroom, and "freaked out" when he saw what Pailing was doing. He contends his involvement was limited to thereafter instructing Pailing as to how to tie Powell and place her body in the trunk of her car. Carpenter argues that such view of the evidence is reasonable and could support only a conviction for accessory after the fact, not first-degree murder on a premeditation or felony murder theory.
When the evidence is viewed in a light most favorable to the State, it is clear that the trial court did not err in allowing the jury to consider the degree of Carpenter's involvement in Powell's murder. Specifically, the State introduced evidence showing that Carpenter met Powell at a laundromat on Sunday, November 20, 1994, and within two days had invited her to a "party" at his residence with the intent of arranging a sexual encounter between Powell and Neil Pailing. Carpenter was thirty-two years old at the time, while Powell was sixty-two and Pailing was seventeen. The State presented evidence demonstrating that Carpenter lived in a small, efficiency-style residence, where his kitchen and bathroom were separated from his living area/bedroom by only a partition. The State also presented evidence establishing the relative sizes of Carpenter, Powell, and Pailing. Carpenter was approximately six feet four inches tall and weighed approximately 210 pounds, Powell was only five feet eight inches tall and weighed approximately 130 pounds, and Pailing was between five feet ten inches and six feet tall and weighed approximately 120 pounds. The medical examiner testified that Powell's death was caused by blunt trauma and neck compression, with the neck compression requiring total occlusion of the blood vessels in Powell's neck for a period of two to three minutes to cause her death. Moreover, Stephen Dakowitz, one of Carpenter's jail-mates, *1195 testified that Carpenter had originally indicated that Pailing had murdered Powell, but when Pailing was apprehended by the authorities, Carpenter became depressed and admitted to Dakowitz that it was "just the opposite" of what he had told him before. Finally, according to Carpenter's own recorded statement, he simply stood by and watched while Pailing beat and strangled Powell. He then instructed Pailing on how to hog-tie Powell and aided Pailing in disposing of Powell's body by placing her body in the trunk of her car.
Based on the evidence listed above, the trial court had a sufficient basis to conclude that the State had presented a prima facie inconsistency with the defense theory of events. Specifically, given the relationship of the parties, their ages, their relative sizes, and the manner in which Powell was killed, the jury could have rejected Carpenter's contention that it was Pailing alone who had killed Powell while Carpenter stood by and watched because he just "freaked out." Dakowitz's testimony also implicates Carpenter in Powell's murder. In addition to the above evidence presented by the State, it is clear that Carpenter's numerous statements to the police were inconsistent with one another. In similar situations, we have routinely held that the jury was free to reject the defendant's version of the events. See, e.g., Finney v. State, 660 So.2d 674, 680 (Fla.1995) ("In light of Finney's inconsistent statements concerning his interactions with the victim and his activities on the day of the murder, the jury was free to reject Finney's version of events as unreasonable."); Bedford v. State, 589 So.2d 245, 250-51 (Fla.1991) ("Because each of Bedford's several versions of events was inconsistent with the others, the jury reasonably could have concluded that each of these accounts was untrue."). Section 777.011, Florida Statutes (2000),[9] provides:
Whoever commits any criminal offense against the state, whether felony or misdemeanor, or aids, abets, counsels, hires, or otherwise procures such offense to be committed, and such offense is committed or is attempted to be committed, is a principal in the first degree and may be charged, convicted, and punished as such, whether he or she is or is not actually or constructively present at the commission of such offense.
It is clear that the State presented competent, substantial evidence to support a conclusion that Carpenter was at least a principal in a murder committed by Pailing, and, therefore, the trial court properly submitted the issue of Carpenter's involvement in Powell's murder to the jury.
It is also clear that the State presented sufficient evidence for the trial court to submit Carpenter's case to the jury on a felony murder theory with sexual battery as the underlying predicate felony offense. Carpenter's hypothesis of innocence in connection with this theory is that he, Powell, and Pailing had consensual sexual intercourse as a threesome, and then Pailing killed Powell when she belittled Pailing for prematurely ejaculating. The State presented evidence showing that Powell was a religious, church-going, sixty-two year old woman who had not had sexual relations with her close friend John Post even though she and Post had slept in the same bed on several occasions. Further, the State presented evidence demonstrating that Powell suffered several injuries to her vagina which were consistent *1196 with forceful penetration.[10] Moreover, the evidence showed that Powell's own bra was placed across her mouth as a gag while she was still alive, which was inconsistent with consensual behavior and with one of Carpenter's statements to the police that Powell's bra was still on her chest "with one breast exposed." Finally, the State presented evidence that there was no semen found in Powell's vagina, which was inconsistent with Carpenter's statement to the police that Powell belittled Pailing for prematurely ejaculating and that Pailing was not wearing a condom. Based upon all of the evidence presented by the State, as well as the inconsistencies in Carpenter's various versions of events, it is clear that the trial court properly submitted Carpenter's case to the jury for consideration on a felony murder theory with sexual battery as the underlying offense. See Hitchcock v. State, 413 So.2d 741, 745 (Fla. 1982) (finding that the totality of the circumstances, including the age of the victim and her previous chaste character, refuted defendant's claim that his sexual contact with the victim was consensual, and the jury thus "could easily have considered Hitchcock's contention that the girl consented to be unreasonable").
As for premeditation, however, we determine that the State failed to present sufficient evidence to warrant the trial court's submission of Carpenter's case to the jury on that theory. Premeditation is defined as
more than a mere intent to kill; it is a fully formed conscious purpose to kill. This purpose may be formed a moment before the act but must exist for a sufficient length of time to permit reflection as the nature of the act to be committed and the probable result of that act.
Norton v. State, 709 So.2d 87, 92 (Fla.1997) (quoting Coolen v. State, 696 So.2d 738, 741 (Fla.1997)). "Evidence from which premeditation may be inferred includes such matters as the nature of the weapon used, the presence or absence of adequate provocation, previous difficulties between the parties, the manner in which the homicide was committed, and the nature and manner of the wounds inflicted." Holton v. State, 573 So.2d 284, 289 (Fla.1990) (quoting Larry v. State, 104 So.2d 352, 354 (Fla.1958)). During the guilt phase, the State presented evidence that Carpenter had arranged for the "party" at which Powell was killed, and the State also presented evidence that Powell died as a result of blunt trauma and neck compression, with the neck compression requiring total occlusion of the blood vessels in Powell's neck for two to three minutes to cause her death. As discussed above, the State also presented the testimony of Stephen Dakowitz, who testified that Carpenter had implicated himself in the murder of Ann Powell. The State argues that this evidence supports a finding of premeditation, while Carpenter argues that such evidence does not exclude every reasonable hypothesis that Powell's death was effected without a premeditated design. After reviewing the evidence and relevant case law, we find that Carpenter's position on this issue must prevail.
Most instructive on this issue is our prior decision in Kirkland v. State, 684 So.2d 732 (Fla.1996). In that case, the victim's death was caused by a "very deep, complex, irregular wound of the neck," which cut off the victim's ability to breathe and caused extensive bleeding. Id. at 733. The jury found the defendant guilty of first-degree murder, and he challenged that finding on appeal, arguing that the *1197 evidence was insufficient to support a premeditation theory. See id. at 734-35. The State argued that a premeditation theory was supported by the nature of the victim's neck wound, which required multiple slashes, combined with other wounds caused by blunt trauma, as well as the existence of friction between the defendant and the victim. See id. In rejecting a finding of premeditation, we reasoned:
[T]he State's evidence was insufficient in light of the strong evidence militating against a finding of premeditation. First and foremost, there was no suggestion that Kirkland exhibited, mentioned, or even possessed an intent to kill the victim at any time prior to the actual homicide. Second, there were no witnesses to the events immediately preceding the homicide. Third, there was no evidence suggesting that Kirkland made special arrangements to obtain a murder weapon in advance of the homicide. Indeed, the victim's mother testified that Kirkland owned a knife the entire time she was associated with him. Fourth, the State presented scant, if any, evidence to indicate that Kirkland committed the homicide according to a preconceived plan. Finally, while not controlling, we note that it is unrefuted that Kirkland had an IQ that measured in the sixties.
In Hoefert [v. State, 617 So.2d 1046, 1048 (Fla.1993)], we were unable to find evidence sufficient to support premeditation in a situation in which Hoefert had established a pattern of strangling women while raping or assaulting them. Evidence was presented in that case indicating that the homicide victim, found dead in Hoefert's dwelling, was likewise asphyxiated. Despite the pattern of strangulation, the discovery of the victim in Hoefert's dwelling, and efforts by Hoefert to conceal the crime, this Court found that premeditation was not established. Hoefert, 617 So.2d at 1049. In this case, there is no evidence that Kirkland had established a pattern of extreme violence as had Hoefert. A comparison of the facts in Hoefert and the instant case requires us to find, if the law of circumstantial evidence is to be consistently and equally applied, that the record in this case is insufficient to support a finding of premeditation.
Id. at 735; see also Green v. State, 715 So.2d 940, 944 (Fla.1998) (rejecting State's argument that the nature of victim's wounds, which included strangulation, supported a finding of premeditation, relying on this Court's decisions in Kirkland and Hoefert). The State's reliance on our decisions in Holton and Hitchcock is misplaced here because even though both of those cases involved a strangulation death, there were other factors present in those cases that supported a finding of premeditation. See Holton, 573 So.2d at 289-90 (involving defendant who had fresh scratch marks on his chest the day after the murder and victim with long fingernails, suggesting that a struggle occurred which belied the defendant's assertion that the killing was accidental); Hitchcock, 413 So.2d at 745 (finding that defendant's statement to jail-mate that he choked the victim, took her outside, then choked her againall to quiet hersupported a finding of premeditation). While Carpenter's version of the events may not be true, the evidence does not exclude the reasonable hypothesis that Powell was killed, without premeditation, after she rebuffed sexual advances made by Carpenter and Pailing. Accordingly, we determine that the trial court should have granted Carpenter's JOA motion with regard to only the premeditation theory of first-degree murder.

B. FIRST-DEGREE FELONY MURDER JURY INSTRUCTION
As a second guilt phase issue, Carpenter argues that the trial court erred in instructing *1198 the jury with a modified instruction for first-degree felony murder. After reviewing the record in this case and relevant case law, we determine that Carpenter is not entitled to relief on this issue.
At the jury charge conference, the State requested that the trial court modify the standard jury instruction for first-degree felony murder to incorporate a "principals" theory of liability. Specifically, the State requested that the trial court include the phrase "or his principal" immediately following Carpenter's name in paragraphs 2.a. and 2.b. of the first-degree felony murder standard jury instruction, presumably to reflect Neil Pailing's involvement in the sexual battery predicate felony offense. Thus, instead of stating: "The death occurred as a consequence of and while David C. Carpenter was engaged in the commission of sexual battery[,] or the death occurred as a consequence of and while David C. Carpenter was attempting to commit sexual battery," the proposed instruction provided: "The death occurred as a consequence of and while David C. Carpenter or his principal was engaged in the commission of sexual battery[,] or the death occurred as a consequence of and while David C. Carpenter or his principal was attempting to commit sexual battery." (Emphasis added.) The State also proposed the same modification to paragraphs 2.a. and 2.b. of the third-degree felony murder instruction, with aggravated battery as the asserted underlying predicate felony offense. Finally, the State requested that the trial court give the standard instruction on principals, which provided:
If two or more persons help each other [commit] [attempt to commit] a crime and the defendant is one of them, the defendant is a principal and must be treated as if [he][she] had done all the things the other person or persons did if the defendant: (1) knew what was going to happen (2) intended to participate actively or by sharing in an expected benefit and, (3) actually did something by which [he][she] intended to help [commit] [attempt to commit] the crime.[11]
Relevant to Carpenter's claim on appeal, defense counsel objected to the proposed *1199 first-degree felony murder instruction, specifically arguing that there was no case law supporting a deviation from the standard instruction.[12] Defense counsel asserted that if the felony murder instruction was to be given, only the standard paragraph 2.a. instruction would be appropriate. Additionally, before the trial court proceeded after agreeing to instruct the jury on proposed paragraphs 2.a. and 2.b. of the first-degree felony murder charge as modified by the State, defense counsel again raised a "strenuous objection" to the instruction. Further, defense counsel objected to the reading of the standard principals instruction "as not being based on the evidence in the case," and the trial court noted the objection and permitted a continuing objection on the principals instruction. Finally, defense counsel argued in Carpenter's motion for new trial that the court erred in improperly instructing the jury during the guilty phase of the trial.
The State asserts that even though defense counsel objected to the modified first-degree felony murder instruction during the jury charge conference, the issue has not been preserved for our review because (1) defense counsel did not renew the objection to the modified first-degree felony murder charge at the close of the charge conference or when the jury was instructed; and (2) the trial court granted defense counsel's request to give the jury a special instruction on accessory after the fact and independent acts. See Answer Brief at 17-18. Contrary to the State's position, however, the fact that defense counsel did not renew its objection to the jury instructions clearly does not bar review here. See, e.g., State v. Heathcoat, 442 So.2d 955, 955-56 (Fla.1983) (finding that defense counsel sufficiently preserved jury instruction issue for review despite counsel's failure to object where the record clearly showed that defense counsel requested a specific instruction and the trial court "clearly understood the request and just as clearly denied the request"); Flint v. State, 463 So.2d 554, 555-56 (Fla. 2d DCA 1985) (relying on Heathcoat in finding that defense counsel could appeal jury instruction issue where charge conference colloquy indicated that defense counsel preserved objection to the trial court's failure to give requested instructions); see also Hubbard v. State, 411 So.2d 1312, 1314-15 (Fla. 1st DCA 1981) (en banc); Saulsberry v. State, 398 So.2d 1017, 1017-18 (Fla. 5th DCA 1981). It is clear that defense counsel satisfied the requirements of Florida Rule of Criminal Procedure 3.390(d)[13] by objecting during the charge conference and specifically advising the trial court of the basis for the objection. Further, the fact that the trial court granted defense counsel's request to give an independent acts instruction does not affect the preservation issue, although it does impact the merits of the jury instruction issue.
In analyzing the merits of Carpenter's jury instruction issue, we note the following:
This Court has explained that a trial court has wide discretion in instructing *1200 the jury, and the court's decision regarding the charge to the jury is reviewed with a presumption of correctness on appeal. Kearse v. State, 662 So.2d 677, 682 (Fla.1995). In that regard, a trial judge in a criminal case is not constrained to give only those instructions that are contained in the Florida Standard Jury Instructions. Cruse v. State, 588 So.2d 983 (Fla.1991), cert. denied, 504 U.S. 976, 112 S.Ct. 2949, 119 L.Ed.2d 572 (1992).
James v. State, 695 So.2d 1229, 1236 (Fla. 1997); see also Fla.R.Crim.P. 3.985; Steele v. State, 561 So.2d 638 (Fla. 1st DCA 1990); see generally 15A Fla.Jur.2d Criminal Law § 3507 (1993). We also note, however, that it is preferable that a standard jury instruction be given if it adequately explains the law, see, e.g., McGuire v. State, 639 So.2d 1043, 1047 (Fla. 5th DCA 1994), and giving a non-standard instruction that misleads the jury is reversible error. See, e.g., Doyle v. State, 483 So.2d 89, 90 (Fla. 4th DCA 1986). In analyzing the modified instructions given in this case, we determine that the trial court did not abuse its discretion in giving those instructions.
As the State points out, Carpenter does not challenge on appeal the fact that the trial court gave the jury the standard instruction on principals. Instead, Carpenter argues that adding the phrase "or his principal" to the standard first-degree felony murder instruction "made it easier for the State to obtain a conviction." Initial Brief at 33. Although placement and utilization of the phrase "or his principal" may have been inartful, it was consistent with another portion of the standard first-degree felony murder instruction. As a whole, the instruction given by the trial court read as follows:
Before you can find the defendant guilty of first degree felony murder, the state must prove the following three elements beyond a reasonable doubt: One, Ann Powell is dead. Two, the death occurred as a consequence of and while David C. Carpenter or his principal was engaged in the commission of sexual battery, or the death occurred as a consequence of and while David C. Carpenter or his principal was attempting to commit sexual battery. Three, David C. Carpenter was the person who actually killed Ann Powell, or Ann Powell was killed by a person other than David C. Carpenter, but both David C. Carpenter and the person who killed Ann Powell were principals in the commission of sexual battery.

(Emphasis added.) The trial court followed this instruction with a proper standard instruction on the law of principals, and then gave a specially requested instruction on independent acts after it read the modified first-degree murder instruction:
If you find that the murder of Ann Powell was committed by a person or persons other than David C. Carpenter, and that the felony murder first degree was a totally independent act of someone other than David C. Carpenter, and if you further find that David C. Carpenter did not participate in the felony murder first degree in that it was completed prior to any participation he might have had, then you should find David C. Carpenter not guilty of felony murder first degree.
Based on the above, it is clear that the modified instruction for first-degree felony murder given by the trial court was consistent with the law of principals. Moreover, by giving the special independent acts instruction, the trial court made it clear to the jury that Carpenter could not be found guilty for acts committed solely and independently by another. Therefore, we determine *1201 that Carpenter is not entitled to relief on this issue.

C. DECLARATIONS AGAINST PENAL INTEREST
As his third and final issue relating to the guilt phase of the trial, Carpenter argues that the trial court erred in excluding the testimony of William Shay and Carlos Mendoza, who were prepared to testify concerning self-inculpatory, out-of-court statements made by Pailing while Shay, Mendoza, Pailing, and Carpenter were jailed together. As more fully explained below, we determine that the trial court committed harmful error in prohibiting Shay and Mendoza from testifying concerning Pailing's statements.
The issue before us primarily involves section 90.804(2)(c), Florida Statutes (2000),[14] which provides that the following are not excluded as hearsay if the declarant is unavailable as a witness:
A statement which, at the time of its making, was so far contrary to the declarant's pecuniary or proprietary interest or tended to subject the declarant to liability or to render invalid a claim by the declarant against another, so that a person in the declarant's position would not have made the statement unless he or she believed it to be true. A statement tending to expose the declarant to criminal liability and offered to exculpate the accused is inadmissible, unless corroborating circumstances show the trustworthiness of the statement.
In analyzing this issue, we note that a trial judge's ruling on the admissibility of evidence will not be disturbed absent an abuse of discretion. See, e.g., Blanco v. State, 452 So.2d 520, 523 (Fla.1984).
According to Shay's proffered testimony, he and Pailing were in a program together at the Pinellas County Jail entitled "Changing Criminal Thoughts" in early 1995, and it was there that he and Pailing discussed this case. On one occasion, when Shay caused Pailing to become "upset" about something concerning the case,[15] Pailing "said that he did it." According to Shay, Pailing explained that "David [Carpenter] set him up with this woman, and they were at Dave's house.... And Neil and this woman were in the bedroom and Dave heard a bunch of noise. Dave went into the bedroom, and I guess the woman was dead there because Neil said then David justthey didn't know what to do, so Dave helped him get the body out of the house. That's when they tookhe said he took and tried to torch the car or something with the body in it." Shay testified that Pailing admitted that he did "the actual murder with a gun or something, and it was in the third drawer of the dresser"; he hit the woman in the head with the gun. According to Shay, Pailing also confessed, "I killed her, I raped her, I burned her up." Shay admitted that he was friends with Carpenter and was housed with him for over two months, and when asked if he did not like Pailing, he stated, "I still talk to him today if I seen him."
According to Mendoza's proffered testimony, he was in the same pod with Pailing for about a month in 1995. Mendoza recalled an occasion when he and his cell-mate were talking together in their cell when Pailing entered and said that "he *1202 raped her, he put her in the trunk of the car and burned her." Mendoza acknowledged that he was friends with Carpenter but did not get along with Pailing, describing an incident in which he almost became involved in a physical fight with Pailing.
The State proffered the testimony of Detective Steffens, who had spoken with Mendoza and Shay with regard to Pailing's statements. According to Detective Steffens' proffered testimony, Shay advised him that Pailing "said he was with the victim Ann Powell and they were in the bedroom and something happened, at which time Neil hit her over the head and called David Carpenter into the room and she was killed." Detective Steffens also testified that Shay did not initially tell him about the exact quote from Pailing"I killed her, I raped her, I burned her up" but instead mentioned the quote three days after the initial interview even though Detective Steffens had pressed Shay during such interview for all relevant information.
After listening to the proffered testimony, hearing oral argument from the parties, and reviewing relevant law, the trial court excluded the testimony of Shay and Mendoza despite the fact that the court found that Pailing was unavailable to testify due to his Fifth Amendment right not to incriminate himself. In so ruling, the trial court stated:
I think the inherent difficulty with the proffered testimony is that, first of all, there's no corroborating evidence of the essential fact. In other words, the essential issue here is who did the murder, and I don't see any corroborating evidence to corroborate the statements that are being proffered. That's the first thing.
The second thing is I think the statements are inherently unreliable because both of the inmates that want to testify or that have been proffered said in part that they didn't like Mr. Pailing, and said words that interpretedamounted to that they were friends with the defendant.
And I think that the absence of corroborating circumstances to corroborate what they were saying, and the inherent untrustworthiness, makes the statements inadmissible under Florida Statute 90.804(2)(c).
Further, the statements which I think basically amount to statements attributed to Pailing that, I raped her, I killed her, I burned her, do not necessarily exculpate this defendant, 'cause those statements do not say that this defendant was not involved.
And for all of those reasons I'm going to rule that these two inmates whose testimony had been proffered cannot testify.
The trial court did rule, however, that Shay and Mendoza could testify during the penalty phase of the trial, if there were such a phase.[16]
After careful consideration, we determine that the trial court erred in ruling that the testimony of both Shay and Mendoza could not be admitted because Pailing did not explicitly state to either of them that Carpenter was not involved in the crime. Carpenter correctly notes that section 90.804(2)(c) applies to statements "tending to expose the declarant to criminal liability and offered to exculpate the *1203 accused." In Voorhees v. State, 699 So.2d 602, 613 (Fla.1997), we determined that it was improper to exclude a codefendant's self-inculpatory, out-of-court statement merely because the statement did not "exonerate" the defendant. See also Sager v. State, 699 So.2d 619, 622 (Fla.1997) (following Voorhees). Importantly, the State's theory in both Voorhees and Sager, as in the present case, included a charge that both defendants were involved in the murder. In this case, while Pailing's statements did not totally exonerate Carpenter, such statements could bolster Carpenter's theory regarding his reduced degree of culpability. On this ground, the trial court erred.
The trial court also excluded the testimony of both Shay and Mendoza because it found that the statements made by Pailing lacked sufficient corroboration showing the trustworthiness of those statements. We disagree. In reaching its conclusion, the trial court apparently questioned the credibility of the in-court witnesses, Shay and Mendoza. Under Florida law, however, the credibility of an in-court witness who is testifying with regard to an out-of-court declaration against penal interest is not a matter that the trial court should consider in determining whether to admit the testimony concerning the out-of-court statement. See Maugeri v. State, 460 So.2d 975, 979 (Fla. 3d DCA 1984); see generally Charles W. Ehrhardt, Florida Evidence, § 804.4 at 804-05 (1999).[17] Instead, it is the jury's duty to assess the credibility of the in-court witness who is testifying about the out-of-court statement. As for corroboration, Pailing's statement was consistent not only with the general version of events recounted in Carpenter's recorded statement, but it was also consistent with other evidence presented at trial, including (1) the fact that sexual contact occurred in connection with Powell's murder; (2) Powell was placed in the trunk of her vehicle; (3) Powell's vehicle was burned with her body inside; (4) Powell was bludgeoned; (5) a "nongun" was located in Carpenter's desk drawer; and (6) one of Pailing's fingerprints was found on Powell's vehicle. We determine that this was sufficient corroboration to allow Pailing's self-inculpatory, out-of-court statements to come before the jury for consideration pursuant to section 90.804(2)(c), Florida Statutes,[18] and we cannot conclude beyond a reasonable doubt that the trial court's error in excluding Pailing's statements was harmless. Accordingly, we reverse *1204 Carpenter's first-degree murder conviction and remand for a new trial.

D. CARPENTER'S PRIOR "GROSS MISDEMEANOR" CONVICTION FROM THE STATE OF NEVADA
Based upon our determination to reverse Carpenter's conviction and remand for a new trial, we need not address Carpenter's proportionality arguments here. However, because Carpenter may again participate in a capital penalty phase hearing should he be found guilty of first-degree murder on remand, we address his arguments concerning his prior "gross misdemeanor" conviction from the state of Nevada. Indeed, this is an issue of first impression before this Court. As more fully explained below, we determine that such conviction does not qualify as an aggravating circumstance under section 921.141(5)(b), Florida Statutes (1999).
Section 921.141(5)(b), Florida Statutes, provides that an aggravating circumstance may be established where "[t]he defendant was previously convicted of another capital felony or of a felony involving the use or threat of violence to the person." As it is clear that Carpenter has not been previously convicted of another "capital felony," the relevant query must be whether Carpenter has been "convicted ... of a felony involving the use or threat of violence to the person."
In Dautel v. State, 658 So.2d 88, 89 (Fla.1995), we were presented with a somewhat analogous question, but it was analyzed in the sentencing guidelines context. In that case, we construed the language set forth in Florida Rule of Criminal Procedure 3.701(d)(5)(B), which provides, "When scoring federal, foreign, military, or out-of-state convictions, assign the score for the analogous or parallel Florida Statute." See Dautel, 658 So.2d at 89-90. We held that only the elements of the out-of-state conviction, not the facts underlying that conviction, should be considered in determining whether the conviction is analogous to a Florida Statute for the purpose of calculating points on a sentencing guidelines scoresheet. See id. at 91. Similarly, in Forehand v. State, 537 So.2d 103, 104 (Fla.1989), we held, again in the sentencing guidelines context, that "the elements of the subject crime, not the stated degree or the sentence received, control in determining whether there is a Florida statute analogous to an out-of-state crime. The various jurisdictions may choose to punish the same acts differently, so the elements of a crime are the surest way to trace that crime."
The State argues that even though Carpenter's prior Nevada conviction for "battery causing substantial bodily harm" was a "gross misdemeanor" in that state, such conviction nevertheless constitutes an aggravating circumstance in this case because it is analogous to the Florida offense of aggravated battery, which is a second-degree felony. See § 784.045(2), Fla.Stat. (1997). While it is true that the elements of the Nevada offense of "battery causing substantial bodily harm" and the Florida offense of "aggravated battery" may be similar in their elements,[19] the *1205 statutory scheme in the present case is much different than the statutory scheme discussed in Dautel and Forehand. Specifically, in those cases, we addressed the sentencing guidelines that not only allow but contemplate a comparison of out-of-state convictions to analogous Florida Statutes. In the present situation, however, the Legislature has not provided for any type of comparison and has specifically provided that only a "felony involving the use or threat of violence to the person" may establish an aggravating factor under section 921.141(5)(b). § 921.141(5)(b), Fla. Stat. (emphasis added). Further, based on the elements and definitions in the Nevada Statutes, it is not clear that the offense would be a felony in Florida. Resolution of the issue would require a separate trial concerning the Nevada events within the trial of this case. Strictly construing this statutory language in favor of the defendant, see, e.g., Donaldson v. State, 722 So.2d 177, 184 (Fla.1998) ("It is axiomatic that penal statutes must be strictly construed."), we determine that an out-of-state conviction related to an offense that has only similar but different elements and does not constitute a "felony" in that state does not amount to a felony in Florida as a matter of law for the purposes of establishing the prior violent felony aggravating circumstance under the present statute. Accordingly, Carpenter's prior "gross misdemeanor" conviction does not here constitute a "felony" aggravating circumstance under section 921.141(5)(b).

III. CONCLUSION
As we have outlined, based on the trial court's refusal to allow Shay and Mendoza to testify with regard to self-inculpatory, out-of-court statements made by Pailing, we reverse Carpenter's conviction and remand for a new trial. Should Carpenter once again be found guilty of first-degree murder, the State may not rely upon Carpenter's prior "gross misdemeanor" conviction from the State of Nevada to establish an aggravating circumstance under section 921.141(5)(b), Florida Statutes.
It is so ordered.
SHAW, ANSTEAD, PARIENTE and LEWIS, JJ., concur.
WELLS, C.J., concurs in part and dissents in part with an opinion.
QUINCE, J., concurs in part and dissents in part with an opinion, in which HARDING, J., concurs.
WELLS, C.J., concurring in part and dissenting in part.
I dissent from the majority's reversal of the first-degree murder conviction. I agree that there was insufficient evidence in the record to find that the defendant himself strangled the victim. However, I conclude that there was clearly sufficient evidence for the jury to conclude that the victim's death by blunt trauma and strangulation was caused by premeditated acts which the defendant aided and abetted within the proscription of section 777.011, Florida Statute (1993). I do not agree that this case is similar to or controlled by Kirkland v. State, 684 So.2d 732 (Fla. 1996), or Green v. State, 715 So.2d 940 (Fla.1998).
*1206 I also dissent from the majority's conclusion that an out-of-state conviction must be considered a felony in that jurisdiction to qualify under the prior violent felony aggravator statute because that conclusion is contrary to an express constitutional provision. But I do conclude that there was harmful error during the penalty phase, and I would remand for a new penalty phase.

Declarations Against Interest
In Voorhees, the trial court ruled that a hearsay statement was inadmissible under section 90.804(2)(c) because the declarant did not "exonerate" the defendant in the hearsay statement. This Court held that ruling to be harmless error.[20]See id. at 613. We stated that "[t]he test of admissibility under this section, after showing the declarant's unavailability, is whether the [hearsay] statements were relevant, tended to exculpate [the defendant], and met the test of corroboration." Id. The hearsay statements at issue here fail the exculpate and corroboration prongs of the Voorhees test.
The trial judge had to determine whether the hearsay statements exculpated Carpenter because the statements neither inculpate or exculpate Carpenter on their face. I would hold that the trial judge correctly evaluated the statements and concluded that they did not exculpate Carpenter.
The Third District has succinctly stated that "Exculpatory statements are declarations against the declarant's interest which indicate that the defendant is not responsible for the crime charged." Maugeri v. State, 460 So.2d 975, 977, n. 2 (Fla. 3d DCA 1984). The testimony of Shay and Mendoza suggests that Carpenter did not engage in the last blow or blows that killed Powell. Whether it was Carpenter or Pailing who provided the last blow that killed Powell is immaterial to finding that Carpenter was a principal in the first degree. That statute[21] imposes equal criminal liability upon individuals who commit criminal offenses with those who aid, abet, counsel, hire, or otherwise procure that offense to be committed.
The majority conjectures that the hearsay statements possibly "could bolster Carpenter's theory regarding his reduced degree of culpability." Majority op. at 1203. However, Carpenter's reduced degree of culpability, if any, would still subject Carpenter to first-degree murder liability by operation of section 777.011. Thus, these hearsay statements do not tend to exculpate Carpenter and must be excluded under the Voorhees test.
It is my view that the trial judge also correctly found that the hearsay statements failed the corroboration prong of the Voorhees test. My reading of the record is that the trial judge only noted that the hearsay statements of Pailing, not the testimony of Shay or Mendoza, were unreliable because no corroborating circumstances existed demonstrating the trustworthiness of the hearsay statements.[22]
*1207 I would uphold the trial judge's exclusion of the hearsay statements and sustain the first-degree murder conviction.

Out-of-State Crimes as Prior Violent Felony Aggravator
I cannot concur with the majority's conclusion that an out-of-state crime must be a felony in that jurisdiction to qualify as a prior violent felony aggravator. Here, Carpenter previously had been convicted of a "gross misdemeanor" in Nevada for the crime of "battery causing substantial bodily harm." As the majority correctly notes, the elements of this Nevada crime are equivalent to the elements of Florida's aggravated battery crime, a felony. I conclude that the trial court correctly held this Nevada conviction qualified as a prior violent felony aggravator under section 921.141(5)(b), Florida Statutes (1993).
Article XVI, section 25 of the 1885 Constitution provided: "The term felony, whenever it may occur in this Constitution or in the laws of the State, shall be construed to mean any criminal offense punishable with death or imprisonment in the State Penitentiary." This provision, with one substantive change, was carried forward as article X, section 10 of the 1968 Constitution. Article X, section 10 provides: "The term `felony' as used herein and in the laws of this state shall mean any criminal offense that is punishable under the laws of this state, or that would be punishable if committed in this state, by death or by imprisonment in the state penitentiary." (Emphasis added.)
Talbot "Sandy" D'Alemberte described the distinction between the above-quoted provisions of the 1885 and the 1968 Constitutions as follows: "The addition extends the definition of `felony' to include criminal offenses committed outside this state which, if they were committed in this state, would be punishable by death or by imprisonment in the state penitentiary." 26A Fla.Stat.Ann. 409 (1995) (commentary by Talbot "Sandy" D'Alemberte).
The First District has stated this new provision to the constitutional felony definition "unmistakably encompasses crimes committed against other sovereigns, which if committed in Florida would be punishable by a Florida court as a felony." Shields v. Smith, 404 So.2d 1106, 1109-10 (Fla. 1st DCA 1981). The First District also opined that they are compelled to use the constitutional definition of felony whenever the word "felony" appears in the Florida Statutes. See id. at 1109.
I agree with the majority that our previous jurisprudence requires an element-by-element analysis to determine the equivalent Florida crime when reviewing an out-of-state conviction. See Forehand v. State, 537 So.2d 103, 104 (Fla.1989); see also Dautel v. State, 658 So.2d 88, 91 (Fla.1995) (only elements of an out-of-state crime and not underlying facts may be used when determining applicable Florida crime). Where I depart from the majority is in their conclusion that an out-of-state crime must be considered a felony in that jurisdiction before it qualifies as a prior violent felony aggravator under section 921.141(5)(b). I conclude that this is not in accord with article X, section 10 of the Florida Constitution. Article X, section 10 is an explicit definition of the term "felony" from which neither this Court nor the Legislature may depart.
I would conclude that Carpenter's Nevada conviction may be used as an aggravator under section 921.141(5)(b) during a new penalty phase because, as the majority already has noted, Carpenter's Nevada *1208 conviction for battery causing substantial bodily harm is equivalent to the Florida felony for aggravated battery.

Ann Demers' Testimony
During Carpenter's penalty phase, the State presented the testimony of Ann Demers, the victim of Carpenter's Nevada criminal episode. Her testimony presented evidence of several uncharged crimes rape,[23] attempted murder, and theftcommitted by Carpenter during a single criminal episode in Nevada that resulted in Carpenter's conviction for battery causing substantial bodily harm. Demers' testimony was repetitive, especially relating to the rape. At least five times during her testimony, Demers testified that Carpenter raped her.[24]
As a general rule, "[d]etails of prior felony convictions involving the use or threat of violence to the victim are admissible in the penalty phase of a capital trial." Waterhouse v. State, 596 So.2d 1008, 1016 (Fla.1992). The purpose for this rule is to engage in a character analysis to determine whether the death penalty is appropriate. See Stewart v. State, 558 So.2d 416, 419 (Fla.1990). But the details of the collateral offense must not become the feature of the penalty phase. See Finney v. State, 660 So.2d 674, 683 (Fla.1995). This Court has limited the scope of the prior violent felony aggravator statute by allowing only evidence of the violent crime for which the defendant was actually convicted. See Donaldson v. State, 722 So.2d 177, 184 (Fla.1998). Harmful error is found where the State presents testimony and argument for a higher offense than that for which the defendant was actually convicted. See id. at 185.
I conclude that allowing Demers to testify to crimes Carpenter was not convicted of in Nevada resulted in harmful error under Donaldson. I would reverse the sentence and remand for a new penalty phase. During Carpenter's new sentencing hearing, I would allow the State to present Demers' testimony that goes to Carpenter's conviction for battery causing substantial bodily harm but would disallow her testimony of crimes for which Carpenter has not been convicted.

Conclusion
I would sustain the first-degree murder conviction but would remand for a new penalty phase. Upon remand, I would allow the Nevada conviction to qualify as a prior violent felony aggravator under section 921.141(5)(b), pursuant to the express provision of article X, section 10, Florida Constitution. If a death sentence is again imposed following resentencing, the trial court should specifically point out its reasoning in respect to the Tison/Enmund culpability requirements.[25]See Benedith v. State, 717 So.2d 472, 476 (Fla.1998).
QUINCE, J., concurring in part and dissenting in part.
I agree with the majority that this case must be remanded for a new trial because of the exclusion of statements made by Pailing to both Shay and Mendoza. However, I agree with Chief Justice Wells that Carpenter's out-of-state conviction, the elements of which coincide with our definition *1209 of aggravated battery, can be used as prior violent felony aggravator.
HARDING, J., concurs.
NOTES
[1] The medical examiner did not identify the laceration at the time she performed Powell's autopsy, but she later identified the laceration in an autopsy photograph approximately two weeks before she testified at Carpenter's trial.
[2] Later in his statement, Carpenter said that he did not actually see Pailing hitting Powell, but instead heard blows being struck when he was in the bathroom.
[3] The jury did not hear the testimony of William Robert Shay and Carlos Mendozaoffered by the defenseconcerning self-inculpatory, out-of-court statements made by Pailing while Shay, Mendoza, Pailing, and Carpenter were jailed together. The admissibility of Shay's and Mendoza's testimony is addressed below.
[4] The trial court erroneously instructed the jury that the permissible sentencing options in Carpenter's case consisted of either death or life without possibility of parole for 25 years, whereas the law for first-degree murders committed on or after May 25, 1994, established the sentencing options of either death or life without possibility of parole. See ch. 94-228, § 1 at 1577, Laws of Fla.; § 775.082(1)(a), Fla.Stat. (Supp.1994).
[5] The trial court found that the State had established three aggravating circumstances: (1) the capital felony was committed while Carpenter was engaged in or an accomplice in the commission of a sexual battery; (2) Carpenter had been convicted previously of a felony involving the use of violence to another person; and (3) the capital felony was especially heinous, atrocious, or cruel.
[6] The trial court afforded "little weight" to the statutory mitigating circumstance that Carpenter's capacity to appreciate the criminality of conduct or to conform his conduct to the requirements of law was substantially impaired.
[7] The trial court found that the State had established three aggravating circumstances: (1) the capital felony was committed while Carpenter was engaged in or an accomplice in the commission of a sexual battery; (2) Carpenter had been convicted previously of a felony involving the use of violence to another person; and (3) the capital felony was especially heinous, atrocious, or cruel.
[8] Carpenter's statements to the police constitute direct evidence that he was at the scene when Powell was killed. See Orme v. State, 677 So.2d 258, 261 (Fla.1996) ("The direct evidence presented by the State placed Orme at the scene of the crime around the time of [the victim's] death. This was established ... by ... Orme's own statement to police."). However, there is no direct evidence regarding premeditation or the commission of a sexual battery. Therefore, as in Orme, we analyze this case as a circumstantial evidence case. See id. at 262. ("Evidence such as this cannot be deemed entirely circumstantial. Nevertheless, we will assume arguendo that it was and proceed to the next question....").
[9] The 1993 version of the statute applies in this case since Powell's murder occurred in November 1994, but the present version of the statute is the same as the 1993 version, except that the Legislature amended the statute in 1997 to replace gender-specific language with gender-neutral language. See ch. 97-102, § 1194 at 1423, Laws of Fla.
[10] The medical examiner could not determine with certainty, however, whether the penetration was consensual or nonconsensual.
[11] This was the standard jury instruction on principals in effect at the time of Powell's murder. See Standard Jury Instructions in Criminal Cases (95-2), 665 So.2d 212, 214 (Fla.1995). By March 1, 1996, the time of the jury charge conference in this case, the instruction had been modified to provide:

If the defendant helped another person or persons [commit] [attempt to commit] a crime, the defendant is a principal and must be treated as if [he][she] had done all the things the other person or persons did if: (1) the defendant had a conscious intent that the criminal act be done, and (2) the defendant did some act or said some word which was intended to and which did incite, cause, encourage, assist or advise the other person or persons to actually [commit] [attempt to commit] the crime.
Id. at 214. Carpenter has not argued on appeal which standard instruction should have been given in his case, and because the standard instruction given by the trial court was the one in effect at the time Powell was murdered, there are no ex post facto issues implicated in this case. Compare Hooper v. State, 703 So.2d 1143, 1144-45 (Fla. 4th DCA 1997) (finding that giving the jury the amended principals instruction where the defendant committed his offense before the amended instruction took effect was an ex post facto violation, although such violation was harmless), review denied, 717 So.2d 538 (Fla.1998), with Larman v. State, 724 So.2d 1230, 1230-32 (Fla. 5th DCA) (finding that giving the amended principals instruction where the defendant committed his offense before the amended instruction took effect would not constitute an ex post facto violation because the amended instruction "is merely a refinement of the original instruction which more accurately defines the elements of principal liability," agreeing with Judge Farmer's concurring in result only opinion in Hooper), review dismissed, 729 So.2d 392 (Fla.1999).
[12] Defense counsel objected to the first-degree felony murder instruction on several other grounds that are not the subject of this appeal.
[13] Florida Rule of Criminal Procedure Rule 3.390(d) provides:

No party may raise on appeal the giving or failure to give an instruction unless the party objects thereto before the jury retires to consider its verdict, stating distinctly the matter to which the party objects and the grounds for the objection. Opportunity shall be given to make the objection out of the presence of the jury.
[14] The current version of section 90.804(2)(c) is substantively identical to the version in effect at the time that Powell was murdered. Specifically, the Legislature amended the statute in 1995 solely to replace gender-specific language with gender-neutral language. See ch. 95-147, § 499 at 387, Laws of Fla.
[15] Shay testified on cross-examination that he might have called Pailing a "rapist."
[16] The State correctly points out that the defense did not attempt to admit the testimony of Shay or Mendoza in the initial penalty phase, and by the time of the second penalty phase, Pailing had pled guilty to committing second-degree murder and arson. Defense counsel secured Mendoza's presence during the second penalty phase but made no attempt to argue for the introduction of his testimony.
[17] We note that there are differing opinions as to whether a trial court should consider the credibility of an in-court witness in determining whether a statement against penal interest is admissible at trial. Compare United States v. Katsougrakis, 715 F.2d 769, 776-77 (2d Cir.1983) (determining that trial court should not consider credibility of in-court witness), Christopher B. Mueller, Federal Evidence, § 502 at 852-53 (1994 ed.) ("[C]redibility is normally for the jury to resolve, and the credibility of a witness who testifies under oath subject to cross-examination with demeanor on view should be judged by the jury, as the better reasoned decisions have concluded."), and Jack B. Weinstein, Weinstein's Federal Evidence 2d, § 804.06[5][c] at 804.58.3-8-4.60 (1999 ed.), with United States v. Bagley, 537 F.2d 162, 167-68 (5th Cir.1976) (determining that trial court may consider in-court witness's credibility in ruling on admissibility of statement against interest), and Michael H. Graham, Handbook of Federal Evidence, § 804.3 at 656 n. 19 (4th ed.1996). We decline to change established Florida law on this point.
[18] Because we base our determination here upon section 90.804(2)(c), Florida Statutes, we need not reach Carpenter's argument that Pailing's self-inculpatory, out-of-court statements should have been admitted under the principles announced in Chambers v. Mississippi, 410 U.S. 284, 93 S.Ct. 1038, 35 L.Ed.2d 297 (1973).
[19] According to the version of Nevada Revised Statutes RS 200.481(1)(a) in effect at the time Carpenter committed his Nevada offense, "battery" was defined as "any willful and unlawful use of force or violence upon the person of another." Further, Nevada Revised Statutes 0.060 defined "substantial bodily harm" as either (1) "Bodily injury which creates a substantial risk of death or which causes serious, permanent disfigurement or protracted loss or impairment of the function of any bodily member or organ;" or (2) "Prolonged physical pain." Comparatively, section 784.03(1)(a), Florida Statutes (1997), provides that a battery occurs when a person (1) "Actually and intentionally touches or strikes another person against the will of the other;" or (2) "Intentionally cause bodily harm to another person," while section 784.045(1)(a), Florida Statutes (1997) provides that "[a] person commits aggravated battery who, in committing a battery: 1. Intentionally or knowingly causes great bodily harm, permanent disability, or permanent disfigurement; or 2. Uses a deadly weapon." It is clear that there is a substantial difference in the possible elements.
[20] This Court wrote, "We find this error harmless as to the guilt phase, however, because we determine that both the other properly introduced evidence and the instructions given to the jury supported Voorhees being found guilty of first-degree murder under a felony-murder theory." Voorhees, 699 So.2d at 613. Interestingly, here, the majority finds the other introduced evidence and jury instructions support a first-degree murder conviction under a felony-murder theory but still finds harmful error. The majority fails to distinguish Voorhees on this point.
[21] See § 777.011, Fla. Stat. (1993).
[22] During his proffered testimony, Shay admitted that his first knowledge of the case came from the guards, newspapers, and jail house rumors. During his proffered testimony, Mendoza stated his knowledge of the case came from a single incident where Pailing walked into his cell, spontaneously declared his guilt, and then refused to further to discuss the case.
[23] Even the State characterized the Nevada criminal episode as a "rape" during its direct.
[24] For example, during one exchange with the prosecutor, Demers said, "This is the worst thing I have ever experienced in my life. Because I worry about other women out there, I want them to know what kind of a person he is. He's a criminal. He's a rapist."
[25] Tison v. Arizona, 481 U.S. 137, 107 S.Ct. 1676, 95 L.Ed.2d 127 (1987); Enmund v. Florida, 458 U.S. 782, 102 S.Ct. 3368, 73 L.Ed.2d 1140 (1982).