BENTON, C.J.
 

 On direct appeal from her conviction and sentence for felony petit theft, Michele DeWolfe contends that the trial court erred in keeping from the jury testimony of two witnesses that they had heard one Bruce Ahlgren confess to the crime of which Ms. DeWolfe has now been convicted. Persuaded that testimony recounting Mr. Ahlgren’s declaration
 
 [1]
 
 against penal interest should have been allowed in evi
 
 *1144
 
 dence, we reverse and remand for a new trial.
 

 Ms. DeWolfe was found guilty of the June 29, 2007 theft of two air conditioners that were taken from a house she had recently vacated. A former neighbor, Terry Manley, testified that she spotted Ms. DeWolfe and an older man removing the air conditioners and placing them in a small pickup truck a day or two after Ms. DeWolfe moved out.
 

 The defense sought to put on the testimony of Donald Gibson (Mr. Ahlgren’s friend of 25 years) and Maegen DeWolfe (the defendant’s daughter), that Mr. Ahl-gren had confessed to stealing the air conditioners from the empty house.
 
 [2]
 
 Conceding the confession was hearsay, appellant relies, here as below, on section 90.804(2)(c), the declaration-against-penal-interest exception to the rule excluding hearsay:
 

 (2) The following are not excluded under s. 90.802, provided that the declar-ant is unavailable as a witness:
 

 [[Image here]]
 

 (c) Statement against interest. A statement which, at the time of its making, was so far contrary to the declarant’s • pecuniary or proprietary interest or tended to subject the declarant to liability or to render invalid a claim by the declarant against another, so that a per
 
 *1145
 
 son in the declarant’s position would not have made the statement unless he or she believed it to be true. A statement tending to expose the declarant to criminal liability and offered to exculpate the accused is inadmissible, unless corroborating circumstances show the trustworthiness of the statement.
 

 § 90.804(2)(c), Fla. Stat. (2010). Mr. Ahl-gren’s unavailability was not at issue: He had died by the time of trial. His confession to theft was, moreover, plainly against his penal interest. But the trial court ruled the hearsay statements did not meet the criteria of section 90.804(2)(c), in that corroborating circumstances did not show the statements to be trustworthy.
 

 It is for the jury, not the judge, to decide whether a declaration against penal interest should be credited. The trial judge exercises only a gatekeeping function, by deciding whether corroborating circumstances show the declaration’s “trustworthiness.” “In determining what constitutes ... a showing [of particularized guarantees of trustworthiness], ... the relevant circumstances only include those that surround the making of the statement and those that render the declarant worthy of belief.”
 
 Franqui v. State,
 
 699 So.2d 1312, 1318-19 (Fla.1997) (citing
 
 Idaho v. Wright,
 
 497 U.S. 805, 819, 110 S.Ct. 3139, 111 L.Ed.2d 638 (1990)).
 

 In making the decision whether to admit evidence of a declaration against penal interest, the trial judge should consider “the language used and the setting in which the statement was made,” and decide whether the statement is “consistent with both the defendant’s general version of events and the other evidence presented at trial.”
 
 Masaka v. State,
 
 4 So.3d 1274, 1282 (Fla. 2d DCA 2009) (citing
 
 Carpenter v. State,
 
 785 So.2d 1182, 1203 (Fla.2001);
 
 Machado v. State,
 
 787 So.2d 112, 113 (Fla. 4th DCA 2001)). Ms. DeWolfe, who acknowledged that, after she had been evicted, she had help moving her personal property from the home she had rented, testified that the air conditioners were still there when she left the house. She denied returning to the house after moving out. She also testified that the front door was broken (and that when she lived there she had kept a couch against it to keep it closed), that cardboard covered a portion of the back door where glass was missing, and that keys were not necessary in order to get into the house.
 

 Mr. Gibson testified on proffer that Mr. Ahlgren admitted to the theft of the air conditioners, and that Maegen DeWolfe, the defendant’s daughter, was present when Mr. Ahlgren confessed and apologized. Maegen testified that Mr. Ahlgren said that he and an accomplice named Patrick had taken the air conditioners from the house which Ms. DeWolfe had lived in until shortly before the theft occurred. She testified that Mr. Ahlgren admitted he took the air conditioners a night or two after Ms. DeWolfe had moved out of the house.
 

 Mr. Gibson testified on proffer that, in early 2009, before he met Ms. DeWolfe, Mr. Ahlgren described getting extra money by taking appliances from empty dwellings and removing and selling the copper. During this conversation, Mr. Gibson reported, Mr. Ahlgren specifically mentioned removing an appliance from a house where “Michele who worked at Shoreline” was living and stated entry was simple because there was cardboard on the back window.
 
 [3]
 

 Separately, Maegen testified on deposition that a few weeks earlier, before he went to the nursing home, Mr. Ahlgren was at Ms. DeWolfe’s home, and bragged
 
 *1146
 
 about stealing appliances in order to remove and sell copper. Maegen testified further that, while she was visiting the nursing home, Mr. Ahlgren told her he and somebody named Patrick returned to the rental house a night or two after Ms. DeWolfe moved out, took the air conditioners, and removed and sold copper to obtain money for drugs. Maegen testified that Mr. Ahlgren stated that Ms. DeWolfe had nothing to do with the theft and that he was sorry she had been arrested for a crime he had committed.
 

 As Ms. DeWolfe’s daughter, Mae-gen DeWolfe presumably had an interest in the outcome of the trial.
 
 [4]
 
 “Under Florida law, however, the credibility of an in-court witness who is testifying with regard to an out-of-court declaration against penal interest is not a matter that the trial court should consider in determining whether to admit the testimony concerning the out-of-court statement. Instead, it is the jury’s duty to assess the credibility of the in-court witness who is testifying about the out-of-court statement.”
 
 Carpenter,
 
 785 So.2d at 1203 (citations omitted).
 
 But see Bearden v. State,
 
 62 So.Sd 656, 664 (Fla. 2d DCA 2011) (stating “an evaluation of the credibility of the witness the defense proposes to use to place the alleged statements on the record is unavoidable”).
 

 Under the cases, the issue is whether Mr. Ahlgren’s statements were sufficiently corroborated. “Once that admissibility threshold was met, the credibility of [Mr. Ahlgren’s] statements and [Ms. DeWolfe’s] defense was for the jury, not the trial court, to assess.”
 
 Masaka,
 
 4 So.3d at 1283. Mr. Ahlgren’s confession at the nursing home was consistent with prior statements he made to Maegen DeWolfe at Ms. DeWolfe’s home.
 
 See Machado,
 
 787 So.2d at 113-14 (holding the trial court properly admitted a hearsay account of statements made to a friend’s son, where the declarant had no reason to fear capture at the time).
 
 See also Chambers v. Mississippi,
 
 410 U.S. 284, 300, 93 S.Ct. 1038, 35 L.Ed.2d 297 (1973) (concluding that the fact that a confession was made spontaneously to a close acquaintance provided assurance of reliability, and that the “sheer number of independent confessions provided additional corroboration”).
 

 Mr. Ahlgren’s confession at the nursing home was consistent with a prior admission to Mr. Gibson in which Mr. Ahlgren had described an area of missing glass being covered by cardboard which made entry easy at a home rented by Michele. This was consistent, moreover, with the trial testimony of Ms. DeWolfe describing the condition of the rental home.
 

 “As a general rule, a trial court’s ruling on the admissibility of evidence will not be reversed, absent an abuse of discretion. However, a court’s discretion is limited by the evidence code and applicable case law. A court’s erroneous interpretation of these authorities is subject to
 
 de novo review.” McCray v. State,
 
 919 So.2d 647, 649 (Fla. 1st DCA 2006) (citations omitted).
 
 See also Lilly v. Virginia,
 
 527 U.S. 116, 136, 119 S.Ct. 1887, 144 L.Ed.2d 117 (1999) (“Nothing in our prior opinions, however, suggests that appellate courts should defer to lower courts’ determinations regarding whether a hearsay statement has particularized guarantees of
 
 *1147
 
 trustworthiness. To the contrary, those opinions indicate that we have assumed, as with other fact-intensive, mixed questions of constitutional law, that ‘[¡Independent review is ... necessary ... to maintain control of, and to clarify, the legal principles’ governing the factual circumstances necessary to satisfy the protections of the Bill of Rights.” (quoting
 
 Ornelas v. United States,
 
 517 U.S. 690, 697, 116 S.Ct. 1657, 134 L.Ed.2d 911 (1996))).
 

 The issue in the present case is whether Ms. DeWolfe was present when the air conditioners were taken — the state offered no other evidence of involvement on her part — or whether, as Mr. Ahlgren reportedly said, he and Patrick took the machines without her knowledge. The declaration against penal interest was “consistent with both the defendant’s general version of events and [much of] the other evidence presented at trial.”
 
 Masajea,
 
 4 So.Sd at 1282 (citing
 
 Carpenter,
 
 785 So.2d at 1208). Only the neighbor’s testimony was to the contrary. In deciding whether the neighbor saw what she said she saw
 
 [5]
 
 or instead mistook what was happening when Ms. DeWolfe and her friend moved her things out, the jury should have been allowed to consider the testimony concerning Mr. Ahlgren’s declaration, and decide whether to give credence to the statements against penal interest the witnesses recounted.
 

 The excluded evidence was central to Ms. DeWolfe’s defense. “Under Florida’s harmless error analysis, the reviewing court must determine ‘whether there is a reasonable possibility that the error affected the verdict.’
 
 State v. DiGuilio,
 
 491 So.2d 1129, 1139 (Fla.1986). The State, as the beneficiary of the error, has the burden to show that the error was harmless.
 
 Id.
 
 ‘If the appellate court cannot say beyond a reasonable doubt that the error did not affect the verdict, then the error is by definition harmful.’
 
 Id.” State v. Contreras,
 
 979 So.2d 896, 911 (Fla.2008). The state does not even argue that any error in excluding the evidence would be harmless.
 
 But see Goodwin v. State,
 
 751 So.2d 537, 545 (Fla.1999) (“The solemn obligation of the Court to perform an independent harmless error review and establish the analysis to be applied in performing that review is so critical to the appellate function that this Court has satisfied its obligation to review for harmless error, even when the State has not argued that the complained of error was harmless.” (citing
 
 Heuss v. State,
 
 687 So.2d 823 (Fla.1996))). It cannot be said beyond a reasonable doubt that the excluded testimony could not have produced reasonable doubt in the minds of the jurors and so have led to acquittal.
 

 Reversed and remanded for a new trial.
 

 WEBSTER and VAN NORTWICK, JJ., concur.
 

 [1]
 

 . The declarant in the present case was far from anonymous. He was known by multiple witnesses, and had been personal friends with one of the proffered witnesses for a quarter of a century.
 

 [2]
 

 . Mr. Gibson testified on proffer in response to questions from counsel and the court:
 

 A. Yes, sir. What he told me was — we was at the [Oar] house drinking one night, you know, taking a break from the cabs, and he told me that a girl that worked at Shoreline named Michele — I didn’t know her name — that Michele, he had went by there and supplemented his income because he didn’t have enough money to pay for his cab that day because we had been drinking.
 

 Q. What was the circumstances of that particular conversation?
 

 A. Well, he told me that — you know, he plays harmonica and he plays music. We had had a couple of pitchers of beer. He told me there was cardboard on the back window. He said it’s like walking through the back door.
 

 Q. My question is, how did that conversation come up at that point?
 

 A. I asked him where he was getting his money from.
 

 Q. Where he's getting—
 

 A. Where he’s getting his extra money. Because and I drove a cab too and I was having to hustle. He always had a little extra money. He told me at that point that he would go around and scope out empty dwellings. And if it seemed like an easy target, he would pick it out, you know, and get some help and go get it.
 

 [[Image here]]
 

 Q. Okay. So he talked about generally going to houses. Did he mention a specific house?
 

 A. No, no, he didn’t. But he told me — he told me that the girl that worked at Shoreline named Michele, and that’s how I found out. And then later on he introduced me to Michele, which she’s a very nice lady.
 

 Q. So he said that — did he say when he had stolen this unit?
 

 A. No, he didn’t tell me when. I don’t even know where the house is at.
 

 Q. And he just specifically said, I stole a unit from a house that somebody who worked at Shoreline lived in?
 

 A. He said appliance. He didn’t say no unit or nothing. He just said he was taking appliances.
 

 Q. And so he was talking generally about all of the things that he did, stealing. Did he mention any other incidences specifically?
 

 A. Well, no. He just told me — he drove a cab, okay, so he knew where all the empty houses was.
 

 [[Image here]]
 

 THE COURT: And did he tell you that he was just stealing air conditioners at random because the houses were vacant?
 

 THE WITNESS: Yes, sir. Because I was wondering where he was getting his extra money.
 

 THE COURT: What did he say he was doing with the appliances?
 

 THE WITNESS: He was tearing them apart and selling them.
 

 THE COURT: Selling what?
 

 THE WITNESS: Selling the copper and then selling the junk.
 

 [3]
 

 . The trial court asked how Mr. Gibson knew Mr. Ahlgren was talking about the air conditioners at issue in this case as opposed to other crimes he was committing:
 

 
 *1146
 
 THE COURT: Okay. And how do you know, sir, that he was talking about this incident in this theft as opposed to other crimes he was committing?
 

 THE WITNESS: Because she’s the only Michele that worked at Shoreline.
 

 THE COURT: You know that, right? You got their payroll down there?
 

 THE WITNESS: No, sir; my cousin worked there.
 

 [4]
 

 . On the other hand, Mr. Gibson did not even meet Ms. DeWolfe until almost two years after the air conditioners disappeared.
 

 [5]
 

 . Ms. DeWolfe's testimony that she did not get along with Ms. Manley suggested that Ms. Manley might be quick to jump to unflattering conclusions about her.
 

 Q. How did you get along with Ms. Manley?
 

 A. Me — we never got along very well. We had some differences in religion. She thought I should go to church more often. I was having trouble with my fifteen-year-old daughter. She was running wild, and I was, you know, trying to take care of her and still have that situation. Terry and I had differences — some serious differences on what I should do and what I shouldn't do. She thought I should call the police on my daughter, and I didn't think that was the right way to handle it.
 

 Ms. Manley acknowledged that she went to Ms. DeWolfe’s house and prayed with her and talked to her about her life-style and things of that nature.