PER CURIAM.
This case is before the Court on appeal from a judgment of conviction of first-degree murder and a sentence of death. We have jurisdiction. See art. V, § 3(b)(1), Fla. Const. For the reasons that follow, we affirm Kaczmar’s conviction but remand for a new penalty phase.
OVERVIEW
Leo Louis Kaczmar, III, was convicted of the first-degree murder of Maria Ruiz. Ruiz’s body was found in the kitchen of the home in which she and Kaczmar lived. She had been stabbed and suffered blunt force trauma to her head. The house had been set on fire in an apparent attempt to hide the murder. Kaczmar was indicted by a grand jury for first-degree murder, attempted sexual battery, and arson. A jury returned a verdict of guilty on all three counts and recommended Kaczmar be sentenced to death by a vote of 11 to 1; the trial court ultimately entered judgment and sentence accordingly. This is Kacz-mar’s direct appeal.
FACTS AND PROCEDURAL HISTORY
On March 2, 2009, Leo Louis Kaczmar, III, was indicted for attempted sexual battery, arson, and first-degree murder of Maria Ruiz. Her body was found on December 13, 2008, in the kitchen of Kacz-mar’s grandmother’s house in Green Cove Springs, in which Kaczmar, his wife (Priscilla), their two children, his uncle (Ed), his father (Leo, Jr.),[1] and Jr.’s girlfriend (Ruiz) all lived. Ruiz had been stabbed and suffered from blunt force trauma to *996 her head. The house had been set on fire in an apparent attempt to hide the murder.
Kaezmar agreed to speak with police and denied any knowledge of the murder or arson and claimed that he had been fishing in Jacksonville all morning. Kaez-mar agreed to have his truck searched and his clothes taken for testing. Kaczmar’s socks appeared to have blood on them, and they were sent for testing.

Guilt Phase

A jury trial commenced on August 9, 2010. Dr. Jessie Giles, the medical examiner who conducted the autopsy on Ruiz, testified that she died from blood loss resulting from approximately ninety-three sharp force injury wounds, consistent with lacerations from a knife. Dr. Giles testified that the sexual assault kit indicated no signs of sexual assault.
Over defense objection, the State called Priscilla Kaezmar to testify twice, once in regard to her learning that the house was on fire the morning after the murder, and once in regard to Kaczmar’s plan to frame Kaczmar’s friend and neighbor, Christopher Ryan Modlin, for Ruiz’s murder.
Modlin testified that he and Kaezmar snorted cocaine and smoked marijuana the night before the murder in Kaczmar’s room, and Kaezmar smoked crack cocaine. Modlin testified that Kaczmar’s behavior became increasingly paranoid, during which Kaezmar paced around his room, thought there were holes in his bed, and claimed water was coming from the bathtub into his room. Modlin testified that Kaezmar told him that he wanted Ruiz to use drugs so that they would have sex and that Kaezmar watched pornography on his television and turned up the volume so Ruiz would hear it. Modlin testified that he left Kaczmar’s house around 11:00 p.m. and returned to his own home.
Julia Ferrell, Kaczmar’s neighbor, testified that she was awakened by loud screaming coming from the Kaezmar home at approximately 5:00 a.m. or 5:80 a.m. on December 13. She identified the voice screaming as that of Kaezmar. Eva Mitchell, another neighbor of Kaczmar’s, testified that she called 911 when she and her husband saw the Kaezmar house engulfed in flames on December 13, between 6:05 a.m. and 6:10 a.m.
Fire marshal detective, Jerry Baker, testified that the fire pattern in the house showed that the fire started in the front of the house, in the living room, near where Ruiz’s body was found, and then spread toward the back. Ryan Bennett, a crime lab analyst for the fire marshal, testified that five of the samples he took from the Kaezmar house tested positive for gasoline.
The State presented pictures and video surveillance from the Hess gas station that showed Kaezmar buying $2 worth of gas at 5:59 a.m. on December 13. Priscilla told police, “that’s Leo,” when asked to identify the man in the surveillance pictures at the Hess gas station.
Detective Danillo Matos testified that according to cell phone tower records, Kaezmar was in Green Cove Springs at 10:53 p.m., 11:04 p.m., 1:40 a.m., and 1:41 a.m., the night of the murder. At 6:26 a.m., Kaczmar’s cell phone signal hit the Green Cove Springs tower, then the Mid-dleburg tower, and then the Jacksonville tower. Matos testified that this pattern showed that Kaezmar left Green Cove Springs en route to Jacksonville at 6:26 a.m., which contradicted Kaczmar’s statements to police that he had been in Jacksonville all morning. Kaczmar’s cell phone signal hit the Green Cove Springs tower again at 7:31 a.m., showing that Kaezmar was once again in Green Cove Springs by that time.
*997 The State introduced evidence from Kaczmar’s socks that were taken by police during their questioning of Kaczmar at the police station. Blood analysis determined blood found on the socks was a mixture of Kaczmar’s and Ruiz’s blood.
William Filancia, Kaczmar’s former cellmate, testified that Kaczmar told him in jail that he had wanted to get lucky and “f — her” the night of the murder. Filancia testified that Kaczmar told him that he chased Ruiz into the bathroom and eventually ended up in a struggle in the kitchen where Kaczmar cut his thumb on a knife Ruiz had pulled out from the kitchen drawer. This sent Kaczmar into a rage and he killed Ruiz with a knife he kept in his pants pocket for fishing. Filancia testified that Kaczmar told him that after he killed Ruiz, he changed his clothes, put them into a garbage bag, buried it in the backyard, bought $2 worth of gas to burn down the house, and then drove to Jacksonville to create an alibi that he was fishing all night. Filancia also testified that Kaczmar discussed plans with him to frame Modlin for the murder with the help of a friend who Filancia knew named Carlos.

Undercover Operation

Detective Charlie Sherman was contacted by Filancia’s attorney and told by Fi-lancia that Kaczmar planned to frame Modlin for Ruiz’s murder. In response, Sherman assigned Detective Humphrey to pose as Carlos in order to record conversations between Kaczmar and himself regarding the plan to frame Modlin. Detective Humphrey met with Kaczmar four times at the jail, and Kaczmar arranged for a map of Kaczmar’s and Modlin’s neighborhood to be sent to Humphrey via an attorney so that it would not be opened by jail personnel. Humphrey testified that at one of the meetings with Kaczmar, he showed Kaczmar that he had received the map and that Humphrey wrote on the back of the map the name Ryan Christopher Modlin and that Kaczmar wanted him to place items beneath Modlin’s house that would implicate him in Ruiz’s murder. Kaczmar also wanted Humphrey to make a call to the Crime Stoppers hotline once the items had been planted and asked Humphrey if he could intimidate another witness into testifying that Modlin implicated himself in Ruiz’s murder.
The defense moved for a judgment of acquittal on each of the charges. The trial court denied the motions. The jury returned a verdict of guilty on all counts.

Penalty Phase

The penalty phase commenced on August 13, 2010. At the outset of the penalty phase, the State and defense stipulated that Kaczmar had previously been convicted of robbery, in which he and a codefen-dant repeatedly struck and kicked the victim and then forcibly took his jewelry and wallet. The trial court acknowledged on the record that this stipulation was sufficient for the State to have met its burden of proving the existence of the prior violent felony aggravator pursuant to section 921.141(5)(b), Florida Statutes (2007). The State presented a victim impact statement from Ruiz’s brother. The defense presented testimony from Kaczmar’s family and friends depicting Kaczmar as a good person and respected business partner who had a troubled upbringing due to his father’s abuse. Dr. Miguel, a child psychiatrist, testified on behalf of the defense that Kaczmar was traumatized as a child by his father’s alcoholism and his own chronic drug abuse. Dr. Miguel also testified that although he believed Kaczmar to be competent during trial, he did not think Kacz-mar knew what he was doing on the night of the murder and did not know right from wrong. The jury recommended a sentence of death by a vote of 11 to 1.

*998
Spencer Hearing

A Spencer[2] hearing was held on September 10, 2010, during which neither the State nor the defense presented testimony. The defense submitted a sentencing memorandum in which evidence for twenty-two mitigators was submitted.
In the trial court’s Sentencing Order, the court found four aggravators, all of which were given great weight: (1) the capital felony was committed by a person previously convicted of a felony and under sentence of imprisonment or placed on community control or felony probation; (2) the capital felony was committed while Kaczmar was engaged in the commission of or an attempt to commit a sexual battery; (3) the capital felony was especially heinous, atrocious, or cruel; and (4) the crime was committed in a cold, calculated, and premeditated manner, without any pretense of moral or legal justification.
In mitigation, the sentencing court found the following mitigators under the statutory catch-all provision, all of which were given slight weight: (1) Kaczmar was raised by an alcoholic father; (2) Kaczmar was raised by a physically and emotionally abusive father; (3) Kaczmar was emotionally traumatized as a child when he witnessed his grandfather’s drowning and his mother’s shooting of his father; (4) Kaczmar had been taught to lie in court; (5) Kaczmar lacked a normal mother-son bonding and relationship; (6) Kaczmar is kind to animals; (7) Kaczmar is a loyal friend; (8) Kaczmar is a good, reliable business partner; (9) Kaczmar had a loving relationship with his aunt Cathy Casleton; (10) Kaczmar was protective of younger family members; (11) Kaczmar suffered long-term effects of illegal drug use; (12) Kaczmar was impaired by illegal drugs on the evening of the murder; (13) Kaczmar suffered from an absence of professional mental health counseling and treatment; and (14) Kacz-mar showed respectful behavior in court. The trial court concluded that the aggravating circumstances far outweighed the mitigation and gave the jury recommendation of death great weight. The trial court imposed the sentence of death.
Kaczmar appeals, raising the following issues: (1) whether the trial court properly denied the motion for judgment of acquittal regarding attempted sexual battery; (2) whether the trial court abused its discretion by allowing the State to call the defendant’s wife to testify regarding a plan to fabricate evidence; (3) whether the trial court committed fundamental error by not sua sponte giving a special jury instruction on the heat of passion defense; (4) whether the trial court abused its discretion in limiting closing arguments by preventing defense counsel from reading language of opinions to the jury; (5) whether the trial court properly denied the motion in limine to require the State not to edit the defendant’s exculpatory statements from the recordings of the undercover meetings; (6) whether the trial court erred in finding the cold, calculated, and premeditated aggra-vator; (7) whether the trial court properly denied the motion for judgment of acquittal regarding premeditated murder; (8) whether the trial court properly denied the motion for judgment of acquittal regarding arson; and (9) whether Florida’s death penalty statute violates the Sixth Amendment right to a jury trial. We address the guilt phase and then penalty phase claims below.
ANALYSIS Guilt Phase Claims

Priscilla Kaczmar’s Testimony

Kaczmar contends that the trial court abused its discretion when it allowed *999 the State to elicit testimony from Priscilla during the guilt phase of his trial because her testimony was privileged. Section 90.504, Florida Statutes (2007), governs the Husband-wife privilege:
(1) A spouse has a privilege during and after the marital relationship to refuse to disclose, and to prevent another from disclosing, communications which were intended to be made in confidence between the spouses while they were husband and wife.
(2) The privilege may be claimed by either spouse or by the guardian or conservator of a spouse. The authority of a spouse, or guardian or conservator of a spouse, to claim the privilege is presumed in the absence of contrary evidence.
(3) There is no privilege under this section:
(a) In a proceeding brought by or on behalf of one spouse against the other spouse.
(b) In a criminal proceeding in which one spouse is charged with a crime committed at any time against the person or property of the other spouse, or the person or property of a child of either.
(c) In a criminal proceeding in which the communication is offered in evidence by a defendant-spouse who is one of the spouses between whom the communication was made.
Our review is for an abuse of discretion. See generally Williams v. State, 967 So.2d 735, 747-48 (Fla.2007) (generally, the standard of review for a trial court’s ruling on the admissibility of evidence is abuse of discretion).
The first time Priscilla was called to testify, the State elicited testimony regarding her observations of Kaezmar the night before the murder. Priscilla testified that she observed Kaezmar and Mod-lin high on cocaine at the Kaezmar house, and then she left with their children to stay at her mother’s house for the night. Because these were observations of her husband’s actions rather than communications between them, privilege does not apply to this testimony. See Kerlin v. State, 352 So.2d 45, 51-52 (Fla.1977) (finding the privilege extends only to communications, not to acts which are in no way communications). The only communication between Priscilla and Kaezmar to which Priscilla testified was Kaczmar’s call to her at 7:30 a.m. on December 13, during which Kaezmar told Priscilla not to return to the house because it was on fire. As Kaezmar contends, this communication was privileged because Kaezmar had a reasonable expectation of privacy while speaking with his wife privately on the phone. However, admitting this information at trial was harmless beyond a reasonable doubt. See Kerlin, 352 So.2d at 53 (violation of the marital privilege subject to harmless error analysis). Priscilla’s testimony was cumulative to the testimonies of several witnesses, including neighbors and rescue responders, who also testified during trial that the house was on fire the morning of December 13. Based on the limited and cumulative nature of the privileged testimony, there is no reasonable possibility Priscilla’s testimony that the house was on fire affected the jury’s verdict. See State v. DiGuilio, 491 So.2d 1129, 1139 (Fla.1986) (“The question is whether there is a reasonable possibility that the error affected the verdict.”).
The second time Priscilla was called to testify, the State elicited testimony from her regarding Kaczmar’s plan to frame Modlin for Ruiz’s murder. Priscilla testified that around March 10, 2010, Kaez-mar asked Priscilla to gather $300. When asked by the State if Kaezmar told her what the money was for, Priscilla testified, “For his friend that was going to help him *1000 with whatever he was going to do.” When asked who this friend was, Priscilla identified William Filancia, Kaczmar’s cellmate, as the person who would help him. When asked if Kaczmar told her what the $300 would be used for, Priscilla testified, “to plant clothes and a knife for Ryan [Mod-lin].” When asked if Kaczmar told her what to do with the $300, Priscilla testified, “He asked me to wear a blue smock” and “to meet up with [Carlos] ... at McDonald’s.” These communications were privileged because Kaczmar had a reasonable expectation of privacy while speaking privately with his wife, and thus, admitting this testimony was error. See Taylor v. State, 855 So.2d 1, 27 n. 30 (Fla.2003) (noting that the spouses’ reasonable expectations of privacy are not waived merely because a husband and wife communicated while in jail). However, we find such error harmless beyond a reasonable doubt.
Priscilla’s testimony that was properly admitted includes that she met a man she knew as “Carlos” at a McDonald’s during their first meeting and in the parking lot of the jail during the second meeting. She testified that at the first meeting she gave “Carlos” $200 because that was all she could afford, and at the following meeting the next Friday, she gave him $100. Priscilla testified that she found out that “Carlos” was really an undercover police officer and that she was arrested about a week after them final meeting. She testified that she entered a plea regarding charges relating to the plan to frame Modlin. Because the above testimony was about Priscilla’s actions rather than communications between her and Kaczmar, these actions are not within the scope of marital privilege and were properly admitted at trial. See Kerlin, 852 So.2d at 51.
Detective Charlie Sherman testified that he met with Filancia several times to confirm the details of Kaczmar’s plan. He also testified that Priscilla wore a blue smock to meet “Carlos,” who was really undercover detective Humphrey, to trade money for the plan. Detective Humphrey also testified in detail regarding Kaczmar’s plan to frame Modlin and provided recordings of their meetings. Thus, all of the information regarding Kaczmar’s plan to frame Modlin was properly admitted independent of Priscilla’s testimony, and Priscilla’s testimony was merely cumulative. Based on the limited and cumulative nature of the privileged testimony, we find there is no reasonable possibility that the jury verdict was affected by the error. See DiGuilio, 491 So.2d at 1139.

Exculpatory Statements

Kaczmar asserts that the trial court erred in allowing the State to play an edited version of the recorded conversations between Kaczmar and undercover detective Humphrey, during which Kacz-mar thought Humphrey was Filancia’s friend, Carlos, who would help Kaczmar frame Modlin for the murder. Specifically, the State redacted Kaczmar’s statements in the recordings where he stated that he was framing Modlin because he was innocent.
As a general rule of law, self-serving statements are inadmissible under section 90.803(18), Florida Statutes (2007). However, section 90.108 provides:
(1) When a writing or recorded statement or part thereof is introduced by a party, an adverse party may require him or her at that time to introduce any other part or any other writing or recorded statement that in fairness ought to be considered contemporaneously. An adverse party is not bound by evidence introduced under this section.
§ 90.108(1), Fla. Stat. (2007). The purpose of this statute, known as the rule of completeness, is to “avoid the potential for creating misleading impressions by taking *1001 statements out of context.” Larzelere v. State, 676 So.2d 394, 401 (Fla.1996). “[P]arties may seek the introduction of other statements when those statements ‘in fairness ought to be considered contemporaneously’ with the introduction of the partial statement,” but “[s]uch a fairness determination falls within the discretion of the trial judge.” Id. at 402. Review of this issue is for abuse of discretion. Id.
The record shows that the State was in agreement that the rule of completeness allowed the defense to introduce exculpatory evidence; however, the State warned the defense that introducing the exculpatory statements would open the door to impeachment of those statements by introducing Kaczmar’s prior felonies pursuant to section 90.806(1), Florida Statutes (2007), which provides:
When a hearsay statement has been admitted in evidence, credibility of the declarant may be attacked and, if attacked, may be supported by any evidence that would be admissible for those purposes if the declarant had testified as a witness. Evidence of a statement or conduct by the declarant at any time inconsistent with the declarant’s hearsay statement is admissible, regardless of whether or not the declarant has been afforded an opportunity to deny or explain it.
As the First District Court of Appeal found in Moore v. State, 943 So.2d 296, 297 (Fla. 1st DCA 2006), pursuant to section 90.806(1), once a defendant introduces his or her hearsay statements into evidence by invoking the rule of completeness, “the credibility of the declarant may be attacked just as if the declarant had testified as a witness.” Here, in response to the State’s warning that introducing the exculpatory statements would open the door to Kaczmar’s prior felonies, defense counsel chose not to invoke the rule of completeness. Accordingly, the trial court did not abuse its discretion in allowing the State to introduce the edited version of the recordings.
Kaczmar also asserts that the trial court abused its discretion by not allowing defense counsel to elicit Kaczmar’s exculpatory statements in a police interrogation during cross-examination of the testifying police officer. The State introduced a videotape of an interview of Kaczmar at the police station after the murder. On cross-examination of the detective who was narrating the events of the taped interview, defense counsel asked the detective if Kaczmar denied setting the fire during the interview. The prosecutor objected, conceding that such exculpatory statements were admissible, but warning defense counsel that eliciting the exculpatory statements would lead to the State introducing Kaczmar’s prior felonies as impeachment. See Kelly v. State, 857 So.2d 949, 949-50 (Fla. 4th DCA 2003) (finding that pursuant to section 90.806(1), such generally inadmissible evidence of the defendant’s prior convictions was admissible for impeachment purposes once the declarant introduced the exculpatory statements through cross-examination of the State’s witness); see generally Huggins v. State, 889 So.2d 743, 756 (Fla.2004) (A defendant who chooses not to testify but who succeeds in getting his or her own exculpatory statements into evidence is subject to having those statements impeached by felony convictions.). In response, defense counsel withdrew his pursuit of introducing the exculpatory statements. Accordingly, the trial court did not abuse its discretion in not admitting the exculpatory statements.

Attempted Sexual Battery

Kaczmar contends that the trial court should have granted his motion for judgment of acquittal on the charge of *1002 attempted sexual battery. We agree. Section 794.011, Florida Statutes (2007), governs sexual battery:
(3) A person who commits sexual battery upon a person 12 years of age or older, without that persons consent, and in the process thereof uses or threatens to use a deadly weapon or uses actual physical force likely to cause serious personal injury commits a life felony....
(4) A person who commits sexual battery upon a person 12 years of age or older without that persons consent, under any of the following circumstances, commits a felony of the first degree....
(b) When the offender coerces the victim to submit by threatening to use force or violence likely to cause serious personal injury on the victim, and the victim reasonably believes that the offender has the present ability to execute the threat.
“Sexual battery” is defined as “oral, anal, or vaginal penetration by, or union with, the sexual organ of another or the anal or vaginal penetration of another by any other object; however, sexual battery does not include an act done for a bona fide medical purpose.” § 794.011(l)(h), Fla. Stat. (2007). Section 777.04, Florida Statutes, (2007), governs attempt:
(1) A person who attempts to commit an offense prohibited by law and in such attempt does any act toward the commission of such offense, but fails in the perpetration or is intercepted or prevented in the execution thereof, commits the offense of criminal attempt....
(5) It is a defense to a charge of criminal attempt, criminal solicitation, or criminal conspiracy that, under circumstances manifesting a complete and voluntary renunciation of his or her criminal purpose, the defendant:
(a) Abandoned his or her attempt to commit the offense or otherwise prevented its commission....
The evidence of attempted sexual battery in this case was purely circumstantial. Thus, the conviction cannot be upheld unless the evidence is inconsistent with any reasonable hypothesis of innocence. See Perry v. State, 801 So.2d 78, 84 (Fla.2001). This Court’s view of the evidence must be taken in the light most favorable to the State. Id. “The State is not required to ‘rebut conclusively every possible variation’ of events which could be inferred from the evidence,” but must introduce competent evidence inconsistent with the defendant’s theory of events. Darling v. State, 808 So.2d 145, 156 (Fla.2002) (quoting State v. Law, 559 So.2d 187, 189 (Fla.1989)).
Based on the record before us, we find that the trial court erred in denying Kacz-mar’s motion for judgment of acquittal for the attempted sexual battery charge. Kaczmar’s statements earlier in the night that he hoped to have sex with Ruiz, without more, are simply not enough evidence to support a finding of attempted sexual battery in this circumstantial case. The State did not provide evidence inconsistent with Kaczmar’s reasonable hypothesis that he killed Ruiz in a fit of rage and not during an attempted sexual battery. Accordingly, the trial court erred in denying the motion for judgment of acquittal for the attempted sexual battery charge. Because the trial court relied on the same evidence in finding the “during the commission of attempted sexual battery” ag-gravator, we strike the aggravator as error. See Williams v. State, 37 So.3d 187, 195 (Fla.2010) (aggravating circumstances in a death penalty case require proof beyond a reasonable doubt).
Kaczmar contends that because he was convicted pursuant to a *1003 general verdict, the error in denying the motion for judgment of acquittal on the attempted sexual battery charge requires a new trial. We disagree. “While a general guilty verdict must be set aside where the conviction may have rested on an unconstitutional ground or a legally inadequate theory, reversal is not warranted where the general verdict could have rested upon a theory of liability without adequate evidentiary support when there was an alternative theory of guilt for which the evidence was sufficient.” San Martin v. State, 717 So.2d 462, 470 (Fla. 1998) (footnotes omitted) (citing Griffin v. United States, 502 U.S. 46, 112 S.Ct. 466, 116 L.Ed.2d 371 (1991)). Although it was error to instruct the jury on both premeditated and felony murder, we find any error harmless because, as addressed further below, the evidence supported conviction for premeditated murder and the jury properly convicted Kaczmar of the first-degree murder on this theory. See San Martin, 717 So.2d at 469.

Premeditated Murder

Kaczmar contends that the trial court should have granted his motion for a judgment of acquittal on the charge of first-degree premeditated murder. We disagree. Section 782.04, Florida Statutes (2007), governs murder in the first degree:
(1) (a) The unlawful killing of a human being:
1. When perpetrated from a premeditated design to effect the death of the person killed or any human being .... is murder in the first degree and constitutes a capital felony[.]
“Premeditation is defined as more than a mere intent to kill; it is a fully formed conscious purpose to kill. This purpose may be formed a moment before the act but must exist for a sufficient length of time to permit reflection as to the nature of the act to be committed and the probable result of that act.” Bradley v. State, 787 So.2d 732, 738 (Fla.2001) (quoting Woods v. State, 733 So.2d 980, 985 (Fla.1999)). Premeditation may be inferred from such facts as “the nature of the weapon used, the presence or absence of adequate provocation, previous difficulties between the parties, the manner in which the homicide was committed, and the nature and manner of the wounds inflicted.” Id. (quoting Norton v. State, 709 So.2d 87, 92 (Fla.1997)). Where there is direct evidence, a trial court’s denial of a motion for judgment of acquittal will be affirmed if the record contains competent and substantial evidence in support of the ruling. McWatters v. State, 36 So.3d 613, 631 (Fla.), cert. denied, — U.S. -, 131 S.Ct. 510, 178 L.Ed.2d 378 (2010).
Kaczmar contends that his killing of Ruiz was second-degree murder and not first-degree premeditated murder. We have held that “the deliberate use of a knife to stab a victim multiple times in vital organs is evidence that can support a finding of premeditation.” Hodges v. State, 55 So.3d 515, 541 (Fla.2010) (quoting Williams v. State, 967 So.2d 735, 758 (Fla.2007)). We have also held that given the “evidence of multiple injuries to the head and neck, a reasonable jury could have concluded that the perpetrator formed a premeditated intent to kill.” Id.
Dr. Giles, the medical examiner, testified that Ruiz died from blood loss resulting from approximately ninety-three stab wounds, including five through the lungs, three through arteries, two to the right skull, shallow stabs to the right side of her face, four on her right side and back near vital organs, and deep slashes to her neck, which cut her larynx and windpipe. Dr. Giles testified that Ruiz would have lost consciousness rapidly after she sustained the fatal wounds, cuts to her brachioce- *1004 phalic artery and her larynx, which would have resulted in her death within a few minutes of being inflicted. Dr. Giles testified that there was little to no blood in Ruiz’s lungs, meaning that her throat was cut late in the attack, and she was likely already dead or dying.
Furthermore, the State provided ample circumstantial and direct evidence tying Kaczmar to Ruiz’s murder. Julia Ferrell, Kaczmar’s neighbor, testified that she was awakened by loud screaming coming from the Kaczmar home at approximately 5:00 or 5:30 a.m. on the morning of the murder. She identified the voice screaming as that of Kaczmar. Blood on Kaezmar’s socks which were taken by police during their questioning of Kaczmar was determined to be a mixture of Kaczmar’s and Ruiz’s blood.
Filancia, Kaczmar’s cellmate, testified that Kaczmar told him that he chased Ruiz into the bathroom and cut his thumb when she grabbed a knife from the kitchen drawer during their struggle, which made him fly into a rage and kill her.
Detective Matos testified that according to cell phone tower records, Kaczmar was in Green Cove Springs at 10:53 p.m., 11:04 p.m., 1:40 a.m., and 1:41 a.m. the night of the murder. At 6:26 a.m., Kaczmar’s cell phone signal hit the Green Cove Springs tower, then the Middleburg tower, and then the Jacksonville tower, indicating that Kaczmar was leaving Green Cove Springs en route to Jacksonville at 6:26 a.m. Kacz-mar’s cell phone signal hit the Green Cove Springs tower again at 7:31 a.m., showing that Kaczmar was again in Green Cove Springs by that time.
When this evidence is viewed in the light most favorable to the State, a rational trier of fact could find the existence of the elements of the crime beyond a reasonable doubt. Therefore, the record contains competent, substantial evidence in support of the trial court’s ruling on the motion for judgment of acquittal of first-degree murder. Accordingly, the trial court did not err in denying the motion for judgment of acquittal regarding the first-degree premeditated murder charge, and the first-degree murder conviction is supported by competent, substantial evidence. See Miller v. State, 42 So.3d 204, 227 (Fla.2010) (this Court has a mandatory obligation to independently review whether there is sufficient evidence to support a sentence of death) (citing Blake v. State, 972 So.2d 839, 850 (Fla.2007)), cert. denied; — U.S.-, 131 S.Ct. 935, 178 L.Ed.2d 776 (2011); Fla. R.App. P. 9.142(a)(6).

Arson

Kaczmar asserts that the trial court should have granted his motion for judgment of acquittal on the charge of arson. We disagree. Section 806.01, Florida Statutes (2007), governs arson:
(1) Any person who willfully and unlawfully, or while in the commission of any felony, by fire or explosion, damages or causes to be damaged:
(a) Any dwelling, whether occupied or not, or its contents;
(b) Any structure, or contents thereof, where persons are normally present, such as: jails, prisons, or detention centers; hospitals, nursing homes, or other health care facilities; department stores, office buildings, business establishments, churches, or educational institutions during normal hours of occupancy; or other similar structures; or
(c) Any other structure that he or she knew or had reasonable grounds to believe was occupied by a human being, is guilty of arson in the first degree, which constitutes a felony of the first degree....
“Structure” means any building of any kind, any enclosed area with a roof over it, *1005 any real property and appurtenances thereto, any tent or other portable building, and any vehicle, vessel, watercraft, or aircraft. § 806.01(3), Fla. Stat. (2007). Where there is direct evidence, a trial court’s denial of a motion for judgment of acquittal will be affirmed if the record contains competent and substantial evidence in support of the ruling. McWatters, 36 So.3d at 631.
Kaczmar contends that the evidence was insufficient to sustain his conviction for arson. Filancia testified that Kaczmar told him that after killing Ruiz, he bought $2 worth of gas and “burned the house.” Kaczmar contends that Filancia is so incredible that his testimony cannot constitute competent, substantial evidence. This claim is without merit. “ ‘[T]he credibility of an in-court witness who is testifying with regard to an out-of-court declaration against penal interest is not a matter that the trial court should consider in determining whether to admit the testimony ... [ijnstead, it is the jury’s duty to assess the credibility of the in-court witness who is testifying about the out-of-court statement.’” Dewolfe v. State, 62 So.3d 1142, 1146 (Fla. 1st DCA 2011) (quoting Carpenter v. State, 785 So.2d 1182, 1203 (Fla.2001)).
Furthermore, the State presented significant circumstantial evidence in addition to Filancia’s testimony supporting Kacz-mar’s conviction for arson. The State presented pictures and video surveillance from the Hess gas station that showed Kaczmar buying $2 worth of gas at 5:59 a.m. on the morning of the murder minutes before the fire began. Priscilla, Kacz-mar’s wife, told police, “that’s Leo,” when asked to identify the man in the surveillance pictures at the Hess gas station. Eva Mitchell testified that she called 911 when she and her husband saw the Kacz-mar house engulfed in flames between 6:05 a.m. and 6:10 a.m. The 911 call recording supports this testimony. Detective Matos testified that according to cell phone tower records, Kaczmar was in Green Cove Springs around the time period of the fire.
Fire marshal detective and expert witness, Jerry Baker, testified that a gas can had been found near the back door in the Kaczmar house. Baker also testified that the fire pattern in the house showed that the fire started in the front of the house in the living room, near Ruiz’s body, and then spread toward the back of the house. Ryan Bennett, a crime lab analyst for the fire marshal, testified that five of the samples he took from the Kaczmar house tested positive for gasoline.
Based on the direct and circumstantial evidence presented at trial, when viewed in the light most favorable to the State, there is competent, substantial evidence to support the trial court’s denial of the motion for judgment of acquittal of this charge. Accordingly, the trial court did not err in denying Kaezmar’s motion for judgment of acquittal for arson.

Heat-of-Passion Jury Instructions

Kaczmar contends that the trial court fundamentally erred in not sua sponte providing a special jury instruction on heat of passion. This claim is without merit. Kaczmar failed to request a special jury instruction or object when the trial court read the standard jury instructions, and because no fundamental error occurred, this issue is not preserved for review. See Coday v. State, 946 So.2d 988, 995 (Fla.2006) (rejecting claim that a special jury instruction on heat of passion was necessary to correctly explain the law when the issue was not preserved for appellate review); see also Stephens v. State, 787 So.2d 747, 755 (Fla.2001) (“[T]he failure to give special jury instructions does not constitute error where the instructions given adequately address the applicable *1006 legal standards.”); Sochor v. State, 619 So.2d 285, 290 (Fla.1993) (the failure to give an instruction unnecessary to prove an essential element of the crime charged is not fundamental error).

Closing Arguments

Kaczmar contends that the trial court erred in not allowing defense counsel to reference other court opinions in his closing argument. This claim is without merit. It is appropriate for an attorney who does not misstate the law to relate it to the facts of the case in closing argument. Taylor v. State, 330 So.2d 91, 93 (Fla. 1st DCA 1976). “[T]he correct practice does not permit counsel to read authorities to the jury, and while counsel may submit his [or her] theory of the law in written requested charges, it is the function of the trial court to charge the law applicable to the issues in the case.” Tindall v. State, 99 Fla. 1132, 128 So. 494, 498 (1930). This issue is reviewed for abuse of discretion. Merck v. State, 975 So.2d 1054, 1061 (Fla.2007).
Although Kaczmar asserts that the trial court improperly limited defense counsel’s closing arguments by limiting counsel’s ability to argue that the murder was second-degree murder rather than first-degree murder, the record is clear that the trial court simply stated that defense counsel should not cite to or read from other cases during closing argument. Furthermore, despite Kaczmar’s contention that the trial court improperly limited his argument by not allowing him to argue that the murder was not premeditated, the record shows that defense counsel did in fact argue that the murder was not premeditated in his closing argument. Accordingly, the trial court did not abuse its discretion in not permitting defense counsel to cite to other cases during closing argument.
Penalty Phase Claims CCP
Kaczmar asserts that the trial court’s finding of the cold, calculated, and premeditated aggravator was error. We agree. In order to establish the CCP aggravator, the evidence must show that: (1) “the killing was the product of cool and calm reflection and not an act prompted by emotional frenzy, panic, or a fit of rage (cold)”; (2) “the defendant had a careful plan or prearranged design to commit murder before the fatal incident (calculated)”; (3) “the defendant exhibited heightened premeditation (premeditated)”; and (4) “the defendant had no pretense of moral or legal justification.” Franklin v. State, 965 So.2d 79, 98 (Fla.2007) (citing Jackson v. State, 648 So.2d 85, 89 (Fla.1994)). “ ‘CCP involves a much higher degree of premeditation’ than is required to prove first-degree murder.” Deparvine v. State, 995 So.2d 351, 381-82 (Fla.2008) (quoting Foster v. State, 778 So.2d 906, 921 (Fla.2001)). “A court must consider the totality of the circumstances when determining whether a murder was committed in a cold, calculated, and premeditated manner.” McGirth v. State, 48 So.3d 777, 793 (Fla.2010), cert. denied, — U.S.-, 131 S.Ct. 2100, 179 L.Ed.2d 898 (2011). The State is required to establish the existence of an aggravating circumstance beyond a reasonable doubt. See Williams v. State, 386 So.2d 538, 542 (Fla.1980). To satisfy the burden of proof, circumstantial evidence must be inconsistent with any reasonable hypothesis which negates the aggravating factor. Eutzy v. State, 458 So.2d 755, 758 (Fla.1984).
We find that the first three prongs of CCP were not established. Regarding the first prong — that the killing was the product of cool and calm reflection and not an act prompted by emotional frenzy, panic, or a fit of rage — Kaczmar contends that he *1007 was not planning to kill Ruiz, but killed her in a frenzied rage. The circumstantial evidence does not rebut this reasonable hypothesis. The State presented no evidence that the murder was committed pursuant to calm reflection. By all accounts, including the testimony of State witness Filancia, Kaczmar killed Ruiz in a fit of rage after he was cut with a knife Ruiz grabbed from the kitchen drawer.
Regarding the second prong of CCP— that the defendant had a careful plan or prearranged design to commit murder before the fatal incident — Kaczmar stabbed Ruiz with a knife that he had in his pocket before the attack; however, there was no evidence presented by the State that Kacz-mar procured the knife in order to kill Ruiz. Rather, Kaczmar consistently claimed that he always kept his knife with him for fishing. Even State witness Filan-cia testified that Kaczmar killed Ruiz with the knife he always kept in his pants pocket for fishing. Thus, there is no evidence that Kaczmar’s knife was in his pocket as part of a prescribed plan to kill Ruiz rather than for use when fishing. Cf. Bell v. State, 699 So.2d 674, 677 (Fla.1997) (upholding CCP where defendant told several people he intended to kill the victim and purchased a gun for that purpose).
Regarding the third prong — that the defendant exhibited heightened premeditation — Kaczmar maintains that Ruiz killed her in the heat of their struggle that quickly escalated when Ruiz rebuffed him. The State did not provide evidence to rebut this assertion. See generally McWatters, 36 So.3d at 642 (striking CCP where although defendant confessed to killing his victim, “he did not confess to having a preformed plan to kill. He claimed that he strangled the victim after she threatened him with a knife.”). Thus, the trial court’s finding of CCP is not supported by competent, substantial evidence. Accordingly, we strike the CCP aggravator.

Proportionality

Although not raised as an issue on appeal, this Court reviews the proportionality of the death sentence in every capital case. Barnes v. State, 29 So.3d 1010, 1028 (Fla.), cert. denied, — U.S. -, 131 S.Ct. 234, 178 L.Ed.2d 155 (2010). “[T]o ensure uniformity in death penalty proceedings, ‘[this Court] make[s] a comprehensive analysis in order to determine whether the crime falls within the category of both the most aggravated and the least mitigated of murders, thereby assuring uniformity in the application of the sentence.’ ” Floyd v. State, 913 So.2d 564, 578 (Fla.2005) (quoting Anderson v. State, 841 So.2d 390, 407-08 (Fla.2003)). Our review involves “ ‘a thoughtful, deliberate proportionality review to consider the totality of circumstances in a case, and to compare it with other capital cases. It is not a comparison between the number of aggravating and mitigating circumstances.’” Tillman v. State, 591 So.2d 167, 169 (Fla.1991) (quoting Porter v. State, 564 So.2d 1060, 1064 (Fla.1990) (emphasis omitted)).
The trial court found 4 aggravators: (1) the capital felony was committed by a person previously convicted of a felony and under sentence of imprisonment or placed on community control or felony probation; (2) the capital felony was committed while Kaczmar was engaged in the commission of or an attempt to commit a sexual battery; (3) the capital felony was especially heinous, atrocious, or cruel; and (4) the crime was committed in a cold, calculated, and premeditated manner, without any pretense of moral or legal justification.
First, the trial court erred in finding the aggravator that the “capital felony was committed by a person previously convicted of a felony and under sentence of *1008 imprisonment or placed on community control or felony probation.” During the penalty phase, Kaczmar stipulated to the court that he qualified for the aggravator of “prior violent felon” pursuant to section 921.141(5)(B), for a prior robbery conviction. However, during the trial court’s pronouncement of sentence and in the Sentencing Order, the trial court omitted the “prior violent felon” aggravator, and instead found the “under sentence of imprisonment or placed on community control or felony probation” aggravator. The State only provided evidence through Kaczmar’s stipulation that he was a prior violent felon, and the trial court relied on this evidence to find the “under sentence of imprisonment or probation” aggravator. The State did not provide evidence that Kacz-mar was under sentence of imprisonment or felony probation at the time of the murder, and therefore, this aggravator was not proven beyond a reasonable doubt. Accordingly, we strike the “under sentence of imprisonment or probation” aggravator.
As provided above, the trial court’s finding of CCP and “committed during the course of attempted sexual battery,” were also in error, and accordingly are stricken. Based on the number of these errors during the penalty phase as reflected in the Sentencing Order, we cannot say beyond a reasonable doubt that such errors were harmless. See Merck, 975 So.2d at 1066 n. 5 (Fla.2007) (factual errors in a sentencing order are subject to harmless error analysis) (citing Lawrenee v. State, 846 So.2d 440, 450 (Fla.2003), and Hartley v. State, 686 So.2d 1316, 1323 (Fla.1996)). Accordingly, we remand for a new penalty phase.[3]
Based on the foregoing, we affirm Kacz-mar’s conviction but remand for a new penalty phase.
It is so ordered.
PARIENTE, LEWIS, QUINCE, LABARGA, and PERRY, JJ., concur.
POLSTON, C.J., concurs in part and dissents in part with an opinion, in which CANADY, J., concurs.

. Leo, Jr. was incarcerated at the time of the murder.

. Spencer v. State, 615 So.2d 688 (Fla.1993).

. Kaczmar urges this Court to reconsider its decisions in Bottoson v. Moore, 833 So.2d 693, 695 (Fla.2002) (observing that the United States Supreme Court did not direct this Court to reconsider Florida’s capital sentencing statute in light of Ring v. Arizona, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002)), and King v. Moore, 831 So.2d 143, 144 (Fla.2002) (same). Because we remand for a new penalty phase, we decline to address this claim.